*Decision will be entered under Rule 50.*

UNITED FINANCE & THRIFT CORPORATION OF TULSA, FORMERLY STATE LOAN COMPANY OF TULSA, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

UNITED FINANCE AND THRIFT CORPORATION OF TULSA COUNTY, FORMERLY THE STATE LOAN COMPANY (OKLAHOMA), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 67398, 67399. Filed October 31, 1958.

---

*Robert Ash, Esq.*, for the petitioners.
*John P. Higgins, Esq.*, for the respondent.

Fisher, *Judge:* This consolidated proceeding involves deficiencies determined against petitioners as follows:

| Docket No. | Petitioner | Taxable year ended | Income tax deficiency |
|---|---|---|---|
| 67399 | United Finance & Thrift Corporation of Tulsa County. | Dec. 31, 1952 | $3,350.41 |
| 67398 | United Finance & Thrift Corporation of Tulsa. | Sept. 30, 1953 | 1,917.27 |

The principal issues presented for our decision herein are: (1) Whether and to what extent petitioner in Docket No. 67399 is entitled to amortize the cost of two separate purported covenants not to compete in the small loan business in Tulsa, Oklahoma, during a specified number of years, which it secured as part of two contracts, executed with two corporate vendors, in which it purchased two small loan companies in that city and (2) whether and to what extent petitioner in Docket No. 67398, assignee of one of these contracts, is entitled to amortize the remaining cost of the purported noncompetition covenant on the part of one of the vendors during the term of the covenant. The question of whether petitioner in Docket No. 67398 is entitled to a net operating loss carryback deduction, and the amount of such deduction, in the fiscal year ending September 30, 1953, from the short fiscal period from October 1, 1953, to December 31, 1953, depends entirely upon our resolution of the first two issues, and will be computed under Rule 50.

### FINDINGS OF FACT.

Some of the facts are stipulated and, as stipulated, are incorporated herein by this reference.

United Finance & Thrift Corporation of Tulsa, formerly State Loan Company of Tulsa (Docket No. 67398), and United Finance and Thrift Corporation of Tulsa County (Docket No. 67399), hereinafter sometimes called petitioners, are wholly owned subsidiaries of State Loan and Finance Company, a Delaware corporation with its principal office in Washington, D. C.

United Finance and Thrift Corporation of Tulsa County (Docket No. 67399) is a corporation organized and existing by virtue of the laws of the State of Oklahoma. It was incorporated on December 1, 1947, as The State Loan Company. Its name was changed to United Finance and Thrift Corporation of Tulsa County in 1954.

Said corporation kept its books and records on an accrual method of accounting and its income has been reported on a calendar year basis. The corporation's income tax return for the calendar year 1952 was timely filed with the district director of internal revenue, Baltimore, Maryland. As said corporation was then known as The State Loan Company (Oklahoma), its return was filed under that name. For convenience, it will be referred to hereinafter as petitioner in Docket No. 67399.

United Finance & Thrift Corporation of Tulsa (Docket No. 67398) is a corporation organized and existing by virtue of the laws of the State of Oklahoma. It was incorporated on January 26, 1951, as Time Finance Company, and on October 10, 1952, its name was changed to State Loan Company of Tulsa. Its name was again changed to United Finance and Thrift Corporation of Tulsa in February 1954.

Said corporation kept its books and records on an accrual method of accounting. For the period involved herein, its income was reported on the basis of a fiscal year ended September 30. Thereafter, said corporation changed its accounting period from a fiscal year ended September 30, to a calendar year basis and filed a return for the (short) period from October 1, 1953, to December 31, 1953. The corporation's income tax returns for the taxable year ended September 30, 1953, and for the period October 1, 1953, to December 31, 1953, were timely filed with the district director of internal revenue, Baltimore, Maryland. As said corporation was then known as State Loan Company of Tulsa, its returns were filed under that name. For convenience, it will be referred to hereinafter as petitioner in Docket No. 67398.

Prior to November 1, 1950, Royal Loan Company, hereinafter sometimes called Royal, operated a small loan business in Tulsa, Oklahoma.

On November 1, 1950, petitioner in Docket No. 67399 executed a contract, denominated "Agreement," with Royal whereby the former purchased from Royal certain assets held by the Tulsa office of Royal Loan Company, including a covenant not to compete, directly or indirectly, in the small loan business within a specified area of the city

of Tulsa, Oklahoma. Said agreement stated in pertinent part as follows:

That in consideration of the payment by the Purchaser to the Seller of the sum of $181,803.00, * * * the Seller hereby sells, assigns, transfers and conveys to the Purchaser, * * *

All loan accounts, indebtedness of borrowers, notes, promises to pay and other obligations secured and described in Exhibit "A" attached hereto and made a part hereof, including all claims, choses in action, bills of sale to secure debt, chattel mortgages, liens, pledges and other instruments and security of every kind and nature in any way pledged, assigned, mortgaged or hypothecated to the Seller as security for or in any manner securing or collateral to the said loans or any of them and including all papers, records, cards and any other documents in connection with said loans, including all notes, promises to pay and other obligations and papers in connection with said accounts; all record cards and lists of former borrowers and all papers and documents of every kind pertaining to said former borrowers, and any and all other papers, documents of any kind pertaining to the present and former borrowers of this office.

In consideration of the further payment by the Purchaser to the Seller of the sum of $23,397.00, receipt of which is hereby acknowledged, the Seller hereby specifically agrees that it will not, for a period of three (3) years from the date hereof, engage or be interested, directly or indirectly in the business of making loans in the amount of $300.00 or less and loans under a discount plan in amounts of $2500.00 or less in the City of Tulsa, Oklahoma or in any other town, village, city or locality within fifteen (15) miles of said city, whether such business be actually conducted within such place or conducted from without such place, and during said period, the Seller hereby specifically agrees that it will not in any manner be interested directly or indirectly, in any loan account or any person any of which indebtedness, borrower's notes, promises to pay, or other obligations are hereby sold, assigned or transferred to the Purchaser.

None of the officers, employees, or stockholders of the seller was a party to the agreement in his individual capacity.

About 2 years later, on October 7, 1952, petitioner in Docket No. 67399 likewise entered into another contract, designated "Agreement," with the Bankers Investment Company, hereinafter sometimes called Bankers, whereby the former purchased from Bankers certain assets held by the small loan office of Bankers in Tulsa, Oklahoma, including a covenant not to compete, directly or indirectly, for the period of 2 years from the date thereof in the small loan business within a specified area of the city of Tulsa. Said agreement provided in pertinent part as follows:

That in consideration of the payment by the Purchaser to the Seller of the sum of $26,125.54, * * * the Seller hereby sells, assigns, transfers and conveys to the Purchaser, * * *

All loan accounts, indebtedness of borrowers, notes, promises to pay and other obligations secured and described in Exhibit "A" attached hereto and made a part hereof including all claims, choses in action, bills of sale, chattel mortgages, liens, pledges and other instruments and security of every kind and nature in any way pledged, assigned, mortgaged or hypothecated to the Seller as security for or in any manner securing or collateral to the said loans or any

of them and including all papers, records, cards and any other documents in connection with said loans.

In consideration of the further payment by the Purchaser to the Seller of the sum of $4,750.00, receipt of which is hereby acknowledged, the Seller hereby specifically agrees that it will not, for a period of two (2) years from the date hereof, engage or be interested, directly or indirectly in the business of making loans of $300.00 or less under the Oklahoma Small Loan Law in the City of Tulsa, Oklahoma, or in any other town, village, city or locality fifteen (15) miles of said city, whether such business be actually conducted within such place or conducted from without such place, and during said period, the Seller hereby specifically agrees that it will not in any manner be interested directly or indirectly, in any loan account or any person any of which indebtedness, borower's notes, promises to pay, or other obligations are hereby sold, assigned or transferred to the Purchaser.

None of the officers, employees, or stockholders of the seller was a party to the agreement in his individual capacity.

Petitioners' parent corporation, State Loan and Finance Company, operates about 185 offices in about 19 to 20 States. Prior to the instant transactions, the parent corporation had purchased a number of other small loan companies. It was the practice of Paul Williams, executive vice president and general counsel of the parent corporation, who negotiated and drafted the two contracts in question on behalf of petitioner in Docket No. 67399, in bargaining for the acquisition of small loan companies to obtain a covenant from the vendor to refrain from competition with the business purchased.

Customers in the small loan business are secured normally by direct mail advertising and other paid media, such as newspaper advertisements, radio, television, and telephone book advertisements. Also, names of potential patrons are obtained from the city directory.

In the small loan business, the typical customer renews or refinances his outstanding loan approximately two point six (2.6) times and on the average remains on the books of the loan company as a borrower for about 27 to 30 months. Both Royal and Bankers had the experience of obtaining repeat business from former borrowers and referral business from friends of former customers.

Corporate officers of petitioner in Docket No. 67399 expected that their corporation would not only earn profit from the businesses purchased (primarily notes and ledger loan accounts) but also additional profit from refinancing and further business with the customers. As a result of the purchases made in the contracts of November 1, 1950, and October 7, 1952, petitioner acquired all of the small loan business of Royal and Bankers in Tulsa, Oklahoma. The petitioner would not have made either of the aforesaid purchases from Royal or Bankers if the corporate vendors had not agreed to execute the covenants not to compete, included as a separate provision in each of the contracts of sale.

After executing said contracts, neither petitioner in Docket No. 67399 nor any subsidiaries of its parent corporation advertised that it was the successor of Royal or Bankers, nor did it ever use the names of the vendors in any connection with the operation of the small loan business in Tulsa.

After the execution of the contract dated November 1, 1950, petitioner in Docket No. 67399 operated at the same location as the vendor, Royal, for approximately 3 months until petitioner could move the office to a different location. Royal did not continue in the small loan business in Tulsa after the execution of said contract, but did continue in that business in other localities. The vice president of Royal, who negotiated said agreement on behalf of his firm, considered the covenant not to compete directly or indirectly, included in the contract of sale, as preventing the vendor corporation from engaging in the small loan business in Tulsa, and believed that the restrictive covenant was likewise binding on him individually.

After the execution of the contract dated October 7, 1952, with Bankers, petitioner never operated at the same location as the vendor in Tulsa. Bankers did not continue in the small loan business in Tulsa directly or indirectly after the execution of the agreement of October 7, 1952, but did continue in the "sales finance" business in Tulsa after that date. After the expiration of the covenant not to compete, included in the aforesaid contract, Bankers went back into the small loan business in Tulsa.

During the year 1952, the parent corporation, State Loan and Finance Company, had one subsidiary operating two offices in Tulsa (a large one and a small one) and another subsidiary operating a small office in Tulsa. The two small offices were not operating profitably, and it was decided to consolidate them into one office. Consequently, on October 10, 1952, the petitioner in Docket No. 67399 sold and transferred to petitioner in Docket No. 67398 all of the remaining assets acquired in the aforesaid purchase of November 1, 1950, from Royal, including:

The covenant on the part of Royal Loan Company not to engage in the small loan business in the City of Tulsa until November 1953, the unamortized cost of which is approximately $8,448.59, and any other prepaid expenses or deferred charges arising out of or incurring in the operation of the office.

At the time of said purchase by petitioner in Docket No. 67398, the books of petitioner in Docket No. 67399 showed the unamortized portion of the amount paid by it to Royal for the covenant not to compete for 3 years was $8,448.59.

The petitioner in Docket No. 67399, on its income tax return for the calendar year 1952, deducted as "new business development expense" the amount of $6,443.08. Said amount included the sum of $5,849.19, which said petitioner allegedly paid to Royal for the covenant not to

compete for the period January 1, 1952, to October 11, 1952, and the amount of $593.89, allegedly paid, in part, to Bankers for the covenant not to compete for the period October 7, 1952, to December 31, 1952.

On its income tax return for the year ended September 30, 1953, petitioner in Docket No. 67398 deducted the amount of $7,798.92 under the heading of "new business development expense," representing the portion of the consideration allegedly paid to Royal (by petitioner in Docket No. 67399, the assignor) for its covenant not to compete, which was allocable to that year. Thereafter, petitioner in Docket No. 67398 changed its accounting period from a fiscal year ended September 30 to a calendar year basis and filed a return for the period October 1, 1953, to December 31, 1953. For the short taxable period October 1, 1953, to December 31, 1953, said petitioner likewise deducted as "new business expense" the amount of $649.67, representing the remaining portion of the consideration allegedly paid to Royal (by petitioner in Docket No. 67399) for its covenant not to compete, which was allocable to that period. On its return for the fiscal period from October 1, 1953, to December 31, 1953, petitioner in Docket No. 67398 claimed a net operating loss in the amount of $2,057.69. In the computation of its net income for the fiscal year ended September 30, 1953, petitioner deducted said amount of $2,057.69, the loss carryback from the short period October 1, 1953, to December 31, 1953.

Respondent, in his statutory notices, disallowed the aforesaid amounts claimed in the respective income tax returns of petitioners for the fiscal periods ending December 31, 1952, September 30, 1953, and December 31, 1953, as "new business development expense" with the explanation that the amounts in question actually represented portions of amounts paid for intangible assets of the businesses purchased, which are not subject to amortization. Respondent accordingly reduced the operating loss claimed by petitioner in Docket No. 67398 by the aforesaid amount of $649.67 and allowed only the net operating loss as adjusted (i. e., $1,408.02) as a carryback deduction in the fiscal year ending September 30, 1953.

The amounts of $23,397 and $4,750, recited in the contracts of sale dated November 1, 1950, and October 7, 1952, are in part attributable to intangible assets in the nature of goodwill or going concern value and in part to vendor's covenant not to compete. Of the amount of $23,397, the sum of $11,817.20 is attributable to such intangible assets and $11,579.80 is attributable to said covenant not to compete. Of the amount of $4,750, the sum of $1,698.16 is attributable to such intangible assets and $3,051.84 is attributable to said covenant not to compete.

## OPINION.

The primary issue for our consideration is purely a factual one; namely, whether The State Loan Company (Oklahoma), now peti-

tioner in Docket No. 67399, paid a consideration for covenants not to compete with their business in a designated area as a distinct and severable item at the time it purchased the tangible assets, including certain ledger loan accounts, of two small loan businesses from the corporate owners thereof in Tulsa, Oklahoma, and if so, the amounts to be attributed to such covenants not to compete.

Petitioner in Docket No. 67399 contends that the separate amounts allocated to the restrictive covenant included in each of the contracts of purchase, dated November 1, 1950, and October 7, 1952, respectively, should be capitalized and amortized ratably over the period of time specified in said covenants under section 23 (1) of the Code of 1939, and Regulations 118, section 39.23 (1)–3.[1] Respondent, on the other hand, claims there was in fact a substantial value in each going business purchased in excess of the recited value of the tangible assets transferred (primarily notes and ledger loan accounts at book value) and that said excess was paid largely for goodwill; that the noncompetition covenant in each contract involved herein was inextricably linked with the transfer of this goodwill; and hence petitioner is not entitled to amortize the lump sum cost of the intangibles purchased over the term of the covenants.

It is well settled that if, in an agreement of the kind which we have here, a covenant not to compete can be segregated as opposed to other items transferred in the overall transaction, and we can be assured that the parties in good faith and realistically have treated the covenant in a separate and distinct manner with respect to value and cost so that a severable consideration for it can be shown, the purchaser is entitled to amortize the price for the covenant paid ratably over the life of the covenant. *Francis Silberman*, 22 T. C. 1240 (1954), and cases cited therein; *B. T. Babbitt, Inc.*, 32 B. T. A. 693, 696 (1935); *Eitingon-Schild Co. and Subsidiaries*, 21 B. T. A. 1163 (1931); *Farmers Feed Co. of New York*, 17 B. T. A. 507 (1929).

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

\* \* \* \* \* \* \*

(1) DEPRECIATION.—A reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

    (1) of property used in the trade or business, or

    (2) of property held for the production of income.

Regs. 118, sec. 39.23 (1)–3. *Depreciation of Intangible Property.* Intangibles, the use of which in the trade or business or in the production of income is definitely limited in duration, may be the subject of a depreciation allowance. Examples are patents and copyrights, licenses, and franchises. Intangibles, the use of which in the business or trade or in the production of income is not so limited, will not usually be a proper subject of such an allowance. If, however, an intangible asset acquired through capital outlay is known from experience to be of value in the business or in the production of income for only a limited period, the length of which can be estimated from experience with reasonable certainty, such intangible asset may be the subject of a depreciation allowance, provided the facts are fully shown in the return or prior thereto to the satisfaction of the Commissioner. No deduction for depreciation, including obsolescence, is allowable in respect of good will.

See also *Rodney B. Horton*, 13 T. C. 143 (1949), appeal dismissed on petitioner's (Commissioner's) motion, 180 F. 2d 354 (C. A. 10, 1950); *Gazette Telegraph Co.* v. *Commissioner*, 209 F. 2d 926 (C. A. 10, 1954), affirming 19 T. C. 692 (1953); *Hamlin's Trust* v. *Commissioner*, 209 F. 2d 761 (C. A. 10, 1954), affirming 19 T. C. 718 (1953).

The burden of proof is, of course, upon petitioner to establish the nonexistence of any substantial goodwill purchased as part of the transaction involved herein, and that the severable consideration recited in each contract for the noncompetition covenant (i. e., $23,397 and $4,750, respectively) was in fact paid, in whole or in part, for said covenant as a separate and distinct item in the negotiations culminating in the purchase of the small loan businesses. The recitations in the contracts are, of course, factors to be considered, but are not conclusive, and do not preclude respondent from further inquiry or this Court from consideration of all of the facts in the record. See *Proctor Shop, Inc.*, 30 B. T. A. 721, 725 (1934), affd. 82 F. 2d 792 (C. A. 9, 1936); *Gooding Amusement Co.*, 23 T. C. 408, 418 (1954), affd. 236 F. 2d 159 (C. A. 6, 1956), certiorari denied 352 U. S. 1031 (1957).

As to the amounts paid for the tangible assets (mainly petty loan accounts) as such, neither party raises any question and we have no doubt that those amounts were reasonable and correctly represented in the contracts. As to the amounts paid for the covenants, it is our view that some substantial part is properly allocable to covenants not to compete but that also some substantial part is attributable to goodwill or going concern value. We do not think that the old record cards had other than nominal value. The significant factor in connection with goodwill is the petitioners' own testimony to the effect that the paper they bought would be turned over on the average 2½ times and would remain on the books of the purchaser for an average period of 30 months. Petitioners' records show that on the basis of experience this prognosis is quite accurate. We think this clearly represents goodwill or going concern value, and is an intangible asset of substantial worth.

In *D. K. MacDonald*, 3 T. C. 720, 726 (1944), we quoted the following definition of the term "goodwill" from the Cyclopedic Law Dictionary (1940 ed.) as follows:

The benefit which arises from the establishment of particular trades or occupations. The advantage or benefit which is acquired by an establishment, beyond the mere value of the capital, stocks, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill or affluence or punctuality, or from other accidental circumstances or necessities or even from ancient partialities or prejudices. Story, Partn. § 99. * * *

It includes only that estimation and repute which is peculiar to the particular establishment. It is that species of connection in trade which induces customers to deal with a particular firm.

In the light of the foregoing, we think that the anticipated turnover, the prospect of which was substantially and accurately ascertainable on the basis of experience, represents a valuable intangible asset.

On the other hand, we think that the covenants not to compete were severable and were likewise substantial in value. In the first place, it took the vendors out of the area as competitors and thereby kept the field open for solicitation by petitioners with two less competitors in the field. In the second place, assuming that for either legal or practical reasons, or both, the vendors would have faced difficulty in getting back, during the period of the covenants, the customers whose accounts had been assigned, nevertheless, a covenant not to compete, removing vendors from the area entirely, gave much greater assurance of elimination of competition than any generalized legal or practical reason why vendors would not have competed if they had remained in the area.

Since we hold that the separate considerations paid by the purchasers represented both intangible assets in the nature of goodwill or going concern value, and for the covenants not to compete, the question arises as to the amount of the separate considerations applicable to each. Neither party offered evidence in support of specific allocations, petitioner urging that the entire separate considerations (other than the amounts paid for the tangible assets) were for the covenants not to compete, while respondent urged that such separate considerations are attributable to goodwill. We think, however, that applying the principles announced in *Cohan* v. *Commissioner*, 39 F. 2d 540 (C. A. 2, 1930), the record supports an appropriate allocation, resolving any doubts against petitioners, who bear the burden of proof. After considering all of the facts established in the record relevant to such allocation, and applying our own judgment thereto, we have arrived at the allocations set forth in our Findings of Fact. The amounts allocated to the covenants not to compete are to be amortized over the respective periods indicated by the purchase contracts.

Computation of the amount of any net operating loss carryback will be made under Rule 50, since the amount may be calculated in the light of our holdings and allocations in discussing the basic issues.

*Decisions will be entered under Rule 50.*