Stanton H. Bryden and Rosemary Bryden v. Commissioner. Clark B. Bristol v. Commissioner.
Bryden v. Commissioner
Docket Nos. 72400, 72401.
United States Tax Court
T.C. Memo 1959-184; 1959 Tax Ct. Memo LEXIS 61; 18 T.C.M. (CCH) 810; T.C.M. (RIA) 59184; September 30, 1959
*61 Burton L. Williams, Esq., 85 Devonshire St., Boston, Mass., for the petitioners. Raymond T. Mahon, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: In these consolidated proceedings respondent determined deficiencies for the year 1954 in Stanton H. Bryden's and Rosemary Bryden's income tax of $1,395.02 and in Clark B. Bristol's income tax of $2,360.10. The sole issue to be decided is the value, if any, to be attributed to the goodwill of the Bristol Insurance Agency, Inc., for the purpose of valuing the distribution to stockholders upon its liquidation in 1954. Petitioner Clark B. Bristol has conceded the only other issue raised in the pleadings. Findings of Fact The stipulated facts are found. Petitioners Stanton H. Bryden and Rosemary Bryden are husband and wife, residing in Bristol, Vermont. They filed an original and an amended joint income tax return for 1954 with the director of internal revenue at Burlington, Vermont. Petitioner Clark B. Bristol, a resident of Manchester, New Hampshire, is Rosemary's father. He filed his income tax return for 1954 with the director of internal revenue for the district of New Hapshire. *62 Bristol has been in the insurance business for over 36 years and is presently the executive vicepresident of American Fidelity Company, Manchester, New Hampshire. On April 1, 1949, Bristol, Stanton and Rosemary formed a corporation known as the Bristol Insurance Agency, Inc., hereafter called the corporation, in Bristol, Vermont, a town with a population of about 1,900. Bristol held 50 per cent of the corporation's outstanding stock and Stanton and Rosemary each held 25 per cent. On April 1, 1949, Bristol purchased an insurance agency located in Bristol, Vermont, from Albert M. Russell for $22,500. Russell had a serious heart condition at this time which became progressively worse by 1954. The purchase agreement provided in part as follows: "1. In consideration of the sum of * * * paid by the Buyer to the Seller, receipt of which is hereby acknowledged, the Seller hereby sells, transfers and delivers to the Buyer his entire interest in said insurance business. It is understood that there is included herein all tangible property located in the said office except personal belongings of the Seller, the good will of said business, all expirations, expiration lists and daily reports *63 of the various companies. There is excluded therefrom all cash on hand and all accounts receivable as of the close of business March 31, 1949. * * *
"3. As a further consideration for the said sale the Seller agrees that for a period of fifteen years he will not engaged in any kind of insurance business in competition with the buyer or his successor within the County of Addison in the State of Vermont." On April 1, 1949, Bristol sold to the corporation for $22,500 all of the assets which he had acquired from Russell. In payment for these assets the corporation issued notes payable to Bristol, Stanton and Rosemary. The tangible assets acquired by Bristol from Russell and sold to the corporation had a value of $3,100. The financial statement of the corporation, prepared on April 1, 1949, showed the following information: ASSETS
Cash
$ 200
Insurance business formerly
A. L. Russell
22,500
$22,700
LIABILITIES AND CAPITAL
Notes Payable: C. B. Bristol
$20,050
Rosemary Bryden
925
Stanton H. Bryden
925
Capital stock paid in
800
$22,700
The corporation's notes payable, which were held by petitioners, were paid off out of the corporation's *64 earnings. On June 16, 1952, the corporation purchased an insurance agency located in the Bristol, Vermont area from Wilfred E. Milton for $2,500. The corporation did not acquire any tangible assets by this purchase. When Bristol purchased Russell's insurance business in 1949 and sold it to the corporation, the corporation acquired 400 customers who were formerly customers of Russell. The corporation acquired approximately 50 customers by its purchase of Milton's insurance agency in June 1952. During the first year of the corporation's existence, Stanton's efforts were directed primarily toward servicing the accounts acquired from Russell rather than acquiring new accounts. The corporation lost one-half of these accounts during this period, but regained some of them at a later date. As of April 1, 1954, about 75 per cent of the customers acquired through the purchase of the Russell agency and about 50 per cent of the customers acquired through the purchase of the Milton agency remained as customers of the corporation. The corporation had the following number of customers at the end of each of its taxable years: Number
Taxable Year Ended
of Customers
March 31, 1950
370
March 31, 1951
414
March 31, 1952
464
March 31, 1953
572
March 31, 1954
625
*65 The corporation primarily sold fire and casualty insurance. Fire insurance is sometimes sold on the basis of a policy covering 3 years, and sometimes on the basis of a policy covering 5 years. When the corporation purchased the Russell agency in 1949, some of the fire insurance customers acquired had 3-year policies in force and a great many had 5-year policies. The corporation acquired some fire insurance customers who had 3-year policies and some who had 5-year policies when it purchased the Milton agency in 1952. The ultimate purpose of the corporation was to develop a sound and reliable insurance business. It attempted to eliminate all of its unreliable and undesirable customers. The corporation developed a sound and steady insurance business with a reliable clientele, which was not subject to violent fluctuations from year to year. Except for automobile insurance, there was little competition for an insurance agency business in the Bristol, Vermont area. The corporation sold some insurance in New York, Massachusetts, Burlington, Vermont and throughout Addison County, Vermont, as well as in the town of Bristol, Vermont. The balance sheets of the corporation, according to *66 its books, for the years ended March 31, 1950 through March 31, 1954, were as follows: 1950
1951
1952
1953
1954
ASSETS
Cash
$ 5,010.71
$ 5,191.61
$ 2,923.65
$ 3,910.47
$18,886.44
Accounts Receivable
6,563.41
7,764.75
7,737.83
11,983.95
12,771.60
Equipment (less depreciation)
4,026.50
3,128.00
3,039.50
2,451.00
2,600.36
Goodwill
19,400.00
19,400.00
19,400.00
19,400.00
19,400.00
Total Assets
$35,000.62
$35,484.36
$33,100.98
$37,745.42
$53,658.40
LIABILITIES
Notes Payable
$16,064.04
$ 8,004.27
$ 2,150.00
$ 1,700.00
$ 1,450.00
Accounts Payable
11,013.19
10,925.76
5,469.96
8,667.20
9,728.30
Accrued Expenses
1,069.74
2,736.54
3,466.02
3,358.55
14,902.90
Deferred Income
2,760.33
2,110.60
3,847.89
5,537.22
5,056.85
Total Liabilities
$30,907.30
$23,777.17
$14,933.87
$19,262.97
$31,138.05
CAPITAL
Common Stock
$ 800.00
$ 800.00
$ 800.00
$ 800.00
$ 800.00
Surplus
3,293.32
10,907.19
17,367.11
17,682.45
21,720.35
Total Capital
$ 4,093.32
$11,707.19
$18,167.11
$18,482.45
$22,520.35
Total Liabilities and Capital
$35,000.62
$35,484.36
$33,100.98
$37,745.42
$53,658.40
*67 The profit and loss statements of the corporation for the years ended March 31, 1950 through March 31, 1954 were as follows: Income - Commissions
$18,880.82
$22,194.25
$24,015.23
$21,730.01
$36,998.47
Expenses: Salaries
6,920.50
7,268.33
7,924.25
15,544.96
25,599.51
Bad Debts
1,666.20
875.80
994.87
596.15
660.16
Depreciation
898.50
898.50
588.50
588.50
640.64
Other Expenses
5,032.56
3,667.34
4,506.60
4,326.51
4,157.36
Total Expenses
$14,517.76
$12,709.97
$14,014.22
$21,056.12
$31,057.67
Net Income
4,363.06
9,484.28
10,001.01
673.89
5,940.80
Federal and State Income Taxes
1,069.74
2,736.54
3,466.02
358.55
1,902.90
Balance
$ 3,293.32
$ 6,747.74
$ 6,534.99
$ 315.34
$ 4,037.90
On April 1, 1954, the corporation was liquidated and a partnership was formed among Bristol, Stanton and Rosemary for the purpose of carrying on an insurance business in Bristol, Vermont. The asset account entitled "Goodwill" on the books of the corporation as of March 31, 1954, in the amount of $19,400, was closed to surplus immediately prior to the liquidation of the corporation. When the corporation was liquidated, all of its *68 assets were transferred to petitioners, who were the only stockholders. Petitioners then transferred these same assets to the partnership as a contribution to capital. The physical location of the insurance business conducted by the partnership was the same as that used by Russell and subsequently by the corporation. The occupation of this location was under a month-to-month tenancy. The partnership carried on its insurance business under the name "Bristol Insurance Agency," which was the same name which the corporation had used and which was displayed on a sign outside the physical plant. The partnership took over the insurance accounts that were formerly serviced by the corporation. For all practical purposes the partnership carried on the same insurance business that was formerly conducted by the corporation. At the time the corporation took over the insurance business formerly conducted by Russell in 1949, Russell was underwriting insurance for approximately 15 insurance companies. The corporation, with a few exceptions, continued to underwrite insurance for these same 15 insurance companies. Most of the insurance companies for which the corporation was underwriting insurance *69 would not appoint another agent to represent them in the same town. Stanton managed the corporation during its entire existence. He did all of the selling and annually contacted all but 6 of the corporation's accounts. Russell introduced him to various people, helped him with suggestive selling and accompanied him to various conventions. Stanton got to know practically everyone in Bristol, Vermont, and was a member of the Bristol Rotary Club, the local posts of the Veterans of Foreign Wars and the American Legion, and the local Masonic order. He was also a member of the Bristol School Committee and Rosemary was a member of the local P.T.A. and the Bristol Women's Club. His residence telephone number was included in the telephone listing of the insurance agency. When it was liquidated on April 1, 1954, the goodwill of the corporation had a fair market value of zero. Opinion According to the stipulation in this case, the only issue before us is the existence and value of the corporation's goodwill on April 1, 1954. The corporation's books had reflected goodwill of $19,400, but this factor *70 may be overcome by evidence of true value. D. K. MacDonald, 3 T.C. 720 [Dec. 13,898]. In Howard B. Lawton, 6 T.C. 1093, 1100, reversed on other issues (C.A. 6) 164 F. 2d 380, we said: "Good will as a concept embraces many elements. No precise definition can be formulated. It is not necesarily confined to a name. It may also attach to a particular location where the business is transacted, or to a list of customers, or to other elements of value in the business as a going concern." At the time of the corporation's liquidation it owned, in addition to its tangible assets, a month-to-month tenancy, its name, agreements to write insurance for certain companies in the Bristol, Vermont area, Russell's and Milton's covenants not to compete, and a list of accounts. The question which we must decide is whether these items had a sufficient fair market value so that a purchaser would have paid an amount for anticipated future profits over and above a fair return on the tangible assets. Estate of A. Bluestein, 15 T.C. 770. In this regard the *71 covenants not to compete are either susceptible of value separately or they are not. Respondent contends they are material here only to the extent that they may have ensured the value of the other items, see Aaron Michaels, 12 T.C. 17, and that such covenants do not by themselves constitute severable assets. Toledo Blade Co., 11 T.C. 1079, affd. (C.A. 6) 180 F.2d 357, certiorari denied 340 U.S. 811. If so, the covenants did not give the corporation anything of independent value which it could distribute on liquidation. The corporation had no lease on its location and therefore no valuable claim which could be transferred. Violet Newton, 12 T.C. 204. We cannot find that the month-to-month tenancy had a value. Nor can we attribute any value to the name under which the corporation conducted its business, even though the use of this name was continued by the partnership after the liquidation. The name of an insurance agency in a town with an approximate population of only 1,900, like Bristol, Vermont, means very little. The corporation did not continue to use the names of the agencies whose businesses it purchased *72 in 1949 and 1952. It may have been the exclusive agent for various insurance companies within its area of operations but we cannot assign any value to such agreements which from all that appears were terminable by the insurance companies at will. See D. K. MacDonald, supra.
If the corporation had goodwill apart from the covenants, the agencies, and its occupancy of the premises, it must have been attributable to the list of accounts. All of the accounts existing in 1954, however, were acquired or retained through the personal abilities of certain individuals. [1] Such a list has very little value, if any, unless those individuals responsible for the accounts were under contract either to remain with the corporation or not to compete with it. Ruth M. Cullen, 14 T.C. 368. Respondent does not dispute petitioners' contention that Stanton managed the corporation and was solely responsible for all sales made by it. What he contends is that the corporation purchased goodwill *73 from Russell [2] in 1949 which it retained until its liquidation in 1954. But whatever goodwill [3] the corporation purchased in 1949 was thus, as we have seen, attributable to the purchased list of accounts which were rendered valuable because of Russell's agreement not to compete. This purchase was certainly not as valuable in 1954 as it was in 1949 because by the later time one-third of the life of the very agreement which gave it value had expired. [4]
Even more important, perhaps, Stanton had by that time been in the business for 5 years, had met all but a few of the accounts and had personally solicited *74 all of the corporation's business. Stanton's personality, coupled somewhat with the help rendered by Russell during the early years of the corporation's existence, was responsible for the acquisition of new accounts and the retention of the accounts purchased. The policyholders were under no obligation to retain the corporation as their agent. Stanton, having no contract to remain in the corporation's employ and no agreement not to compete with it, was theoretically free to set up his own office immediately in competition with any purchaser of the corporate business. Neither Russell's nor Milton's covenants not to compete any longer contributed substantial value to the corporation's list of accounts by 1954. In this case, as in D. K. MacDonald, supra, any value which the corporation had at the time of its liquidation in 1954 "in addition to its tangible assets, was due to the personal ability, business acquaintanceship, and other individualistic qualities of" Stanton. There were 6 accounts with which Stanton had no personal contact. Any value which might be assigned to these accounts as not having been acquired or retained through Stanton's personal efforts is de minimis. *75 They represent less than 1 per cent of the total accounts on the corporation's books when it was liquidated. Whatever goodwill the corporation may have had on April 1, 1954 was without any fair market value. D. K. MacDonald, supra; Howard B. Lawton, supra; Ruth M. Cullen, supra.
Decisions will be entered under Rule 50. Footnotes
1. Respondent makes much of the fact that in 1949 3- and 5-year policies existed on which no selling had to be done. But even the youngest and longest of these had expired by 1954.↩
2. Respondent also suggests that the corporation purchased goodwill from Milton, however his deficiency determination does not appear to include any amount attributable to this purchase. ↩
3. Petitioners contend that the corporation purchased Russell's covenant not to compete rather than his goodwill, citing Rev. Rul. 57-480, 1957-2 C.B. 47↩. 4. This result has nothing to do with questions of depreciation of such covenants which largely involve issues of severable value. United Finance & Thrift Corporation of Tulsa, 31 T.C. 278↩ [Dec. 23,232].