Harry Shwartz and Bertha Shwartz v. Commissioner. Irving Weitz and Anna Weitz v. Commissioner.
Shwartz v. Commissioner
Docket Nos. 78499, 78500.
United States Tax Court
T.C. Memo 1960-228; 1960 Tax Ct. Memo LEXIS 60; 19 T.C.M. (CCH) 1276; T.C.M. (RIA) 60228; October 27, 1960
*60 Prior to 1955, four retail supermarkets, known to the public as "Budget Markets" were owned and operated by three corporations, all the stock of which was in turn owned by petitioners. During 1954 several conferences were held between representatives of petitioners and representatives of Food Fair Stores, Inc., regarding a proposed sale of "Budget Markets" to Food Fair. There were offers and counteroffers. Finally, on December 7, 1954, the parties came to an agreement. As a result of this agreement the three corporations were completely liquidated as of January 10, 1955, and on the same day petitioners sold the principal assets acquired in the liquidations to Food Fair. Petitioners in their 1955 individual income tax returns reported as capital gain the difference between the fair market value of the assets received in the liquidations and the adjusted basis of their stock in the three corporations. Petitioners reported no gain or loss on the sale of the assets to Food Fair since the liquidations and sale took place as of the same day. The agreement of December 7, 1954, had formally allocated $110,000 of the agreed purchase price to a restrictive covenant stating that the sellers *61 agreed not to compete for a period of 2 years. One-half of this allocation was to be paid 30 days after January 10, 1955, and the other half one year thereafter. The respondent determined that the $110,000 should be treated not as consideration for the sale of the assets to Food Fair but as separate consideration for a covenant not to compete, and that the half received by petitioners in the taxable year 1956 should be taxed to them as ordinary income. Held, the respondent erred for the reason that the $110,000 ostensibly paid for the restrictive covenant was in fact "nonseverable" from the total consideration for all the assets purchased from petitioners. Cf. Ray H. Schulz, 34 T.C. 235 (May 19, 1960). Monroe J. Winsten, Esq., and Bernard R. Cohen, Esq., 15 Maiden Lane, New York, N. Y., for the petitioners. Frank V. Moran, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion ARUNDELL, Judge: In these consolidated proceedings respondent determined deficiencies in income tax for the taxable year ended December 31, 1956, against petitioners as follows: Docket
Petitioner
No.
Deficiency
Harry and Bertha Schwartz
78499
$15,115.39
Irving and Anna Weitz
78500
14,324.31
The issues are: (1) Whether the respondent erred in *63 taxing to petitioners in 1956 as ordinary income one-half of $110,000 received by petitioners in 1956, ostensibly paid to them as consideration for a restrictive covenant not to compete contained in an agreement to sell certain assets, entered into on December 7, 1954, and (2) whether petitioners Harry and Bertha Shwartz are entitled to a credit of $598 for income tax withheld in 1956. The respondent, in his brief, agrees that the second issue may be disposed of in a computation under Rule 50. Findings of Fact Petitioners Harry and Bertha Shwartz are husband and wife, residing in East Norwalk, Connecticut. They filed a joint Federal income tax return for the calendar year 1956 with the district director of internal revenue at Hartford, Connecticut. Petitioners Irving and Anna Weitz are husband and wife, residing in Westport, Connecticut. They filed a joint Federal income tax return for the calendar year 1956 with the district director of internal revenue at Hartford. Budget Markets, Inc., was incorporated on March 1, 1940, under the laws of Connecticut and, prior to January 10, 1955, it owned and operated two retail supermarkets located in Connecticut, one at Stamford and one *64 at Norwalk. Budget Market of Summer Street, Inc., was incorporated on October 1, 1952, under the laws of Connecticut and, prior to January 10, 1955, it owned and operated a retail supermarket located in Stamford. Budget Market of Westport, Inc., was incorporated on April 29, 1953, under the laws of Connecticut, and, prior to January 10, 1955, it owned and operated a retail supermarket in Westport. Petitioners Harry and Bertha Shwartz together owned 50 per cent of the issued capital stock of the three above-mentioned corporations (hereinafter referred to as the three corporations), and petitioners Irving and Anna Weitz together owned the remaining 50 per cent of the issued capital stock. During the period here involved, petitioner Irving Weitz was the president, Anna Weitz the secretary, and Harry Shwartz the treasurer of the three corporations. In December 1953 or early in 1954 negotiations were commenced between Irving Weitz, representing all the petitioners, and Myer Marcus, representing Food Fair Stores, Inc. (hereinafter referred to as Food Fair), relative to the sale of the assets of the three corporations. At this first meeting Irving made an offer to Marcus to sell *65 the leases, good will, fixtures and equipment of the three corporations for $1,000,000 and to sell the inventory of the three corporations on a dollar-for-dollar basis. Marcus immediately rejected the offer on the ground that the price was too high but made a counterproposal of $500,000 for the leases, good will, fixtures and equipment, plus dollar-for-dollar on the corporations' inventories. This counter proposal was rejected by petitioners. No further negotiations were held until in the fall of 1954. Upon the termination of the initial negotiations, petitioners decided to remodel two of the stores by installing new equipment and fixtures at a cost of approximately $250,000. While this remodeling was in process, Irving learned that Food Fair had bought a piece of land in Stamford for around $100,000 and was seeking other locations in the areas in which the four "Budget Market" stores were located. Upon gaining this information, petitioners decided to reopen negotiations with Food Fair. In August 1954, a meeting was held between Irving and Marcus, at which meeting Irving told Marcus of the improvements that had been made and that petitioners were then willing to sell the leases, *66 good will, fixtures and equipment for $750,000. It was always understood between the negotiators that the inventory of the four stores could be purchased on a dollar-for-dollar basis. Marcus rejected the $750,000 offer but made a counter proposal of $600,000. Petitioners indicated dissatisfaction with the counteroffer made by Marcus, whereupon Marcus suggested that a conference be arranged in Jersey City to explore further the possibilities of reaching an agreement. In November 1954 a conference was held in Jersey City in the law offices of Stein, Stein, & Engel. At this conference petitioners were represented by Irving, Isidore Feldman, who was a certified public accountant, and an attorney by the name of Slavitt. Food Fair was represented by Marcus and two members of the law firm, one of whom was also the president of Food Fair. At this conference the representatives of Food Fair renewed the offer of $600,000, against which petitioners voiced dissatisfaction. After conferring privately, the representatives of Food Fair made a revised offer. Marcus, speaking for Food Fair, said they were willing to buy for $700,000 but would have to put some phrasing in the agreement about *67 a restrictive covenant for the extra $100,000. Irving asked what that meant and was told that with such a covenant in the agreement, Food Fair would gain some benefit as far as taxes were concerned, and petitioners would agree not to compete with Food Fair. Irving said petitioners had no intention of competing and so had no objection to the covenant but insisted that the price be raised to $750,000. After a recess of a day or two, the conference was resumed and the parties agreed to split the remaining difference of $50,000 and to draw a contract whereby Foor Fair would pay $615,000 for the fixtures and equipment and $110,000 for the covenant, or a total of $725,000. It was also agreed that Food Fair would acquire the leases and good will, but no price was formally allocated to these items. On November 23, 1954, a resolution was approved by the board of directors of each of the three corporations adopting a plan of liquidation and dissolution of each of the corporations and a return of information under section 6043 of the Internal Revenue Code of 1954 reporting the adoption of such resolutions was filed on January 20, 1955, by each of the three corporations *68 with the director of Internal Revenue at Hartford. The plan of liquidation and dissolution adopted by the board of directors of each of the three corporations was identical in all respects and, among other things, such plan provided for the transfer of the assets of the three corporations to the stockholders thereof in proportion to their share ownership in the corporations, subject to liabilities in consideration of and in exchange for the redemption and cancellation of all of the outstanding stock which was to be surrendered by the stockholders. Thereafter, on December 7, 1954, a written agreement to sell was drawn up between petitioners, as sellers, and Food Fair, as buyer, wherein it was agreed in Article III, section 4, that in the event the buyer elects to consummate this agreement, - Buyer shall give Sellers at least one weeks [week] prior written notice thereof which notice shall fix as the closing date any Monday morning at 10:00 A.M. up to and including February 7, 1955 and shall also specify as Inventory Date the Saturday immediately preceding such closing date. If Buyer fails to give notice of its election to consummate such transaction at least one week prior to *69 February 5, 1955, this agreement shall terminate and Buyer shall be relieved of all further responsibilities hereunder. Buyer agrees that if it procures satisfactory Lease Modifications, it will notify Sellers as soon as possible to the end that inventory may be taken as quickly as possible. Among other things, the agreement of December 7, 1954, specifically enumerates and describes the assets to be sold, together with the purchase price thereof, in the following manner: ARTICLE IV Sale and Closing Section 1. Sale: Sellers agree to sell and transfer to Buyer, and Buyer agrees, upon compliance by Sellers at closing with all the terms, conditions and provisions, representations and warranties herein, to purchase and accept from Sellers the following: (a) Fixed Assets. (b) Salable Merchandise Inventory. (c) Assignments of Leases and Lease Modifications. Section 2. Closing: * * * At or prior to said closing, Sellers will deliver to Buyer the following: * * *
(f) Assignments to Buyer of all right, title and interest of Sellers and Corporations in and to the name Budget Markets, and all labels, trademarks, tradenames and licenses used in connection with the operation *70 of Supermarkets, together with restrictive covenant agreements as of the date of closing conforming with the provisions of Article IV hereof. * * *
Section 3. Purchase Price: Subject to Sellers compliance at closing with all the terms and provisions hereof, Buyer agrees after receipt of the various closing documents and instruments referred to in Section 2 hereof, to pay Sellers, at the respective times hereinafter set forth, the following sums as and for the purchase price of the respective items set opposite such sums: (a) Fixed Assets - a sum of $615,000 * * *. (b) Salable Merchandise Inventory - a sum equal to the value thereof as determined under Article II hereof * * *. (c) Agreements not to compete (as per Article VI hereof) (i) Thirty (30) days after closing - $55,000. (ii) One (1) year thereafter - $55,000. Article VI of the agreement of December 7, 1954, is headed "Restrictive Covenants" and is as follows: Each of the Sellers agrees that for a period of two (2) years from and after the closing, he will not (except with Buyer's prior written consent) directly or indirectly own, manage, operate, join, control or participate in the ownership, management *71 or control of, or be connected in any manner with either as employee, owner, partner, agent, stockholder, director, officer of a corporation or otherwise, in any supermarket business or in any business for the retail sale of foods or become interested in any competitor of the Buyer, within the area encompassing the Towns of Greenwich, Stamford, Darien, New Canaan, Norwalk, Wilton, Weston, Westport, and Fairfield in the County of Fairfield, and that during such period, none of them will use or allow corporations to use the name Budget Markets, or any other name for such purpose. Sellers agree that the remedy at law for any breach of any of the foregoing will be inadequate and that Buyer shall be entitled to temporary and permanent injunctive relief without the necessity of proving actual damage to the Buyer. It being agreed that the area aforementioned is used because the Buyers intend to open stores in said area and said area has a reasonable relation to the price for such restriction herein contained. The merchandise inventory in the four supermarkets of the petitioners and received by them in liquidation of their three corporations was in the amount of $340,000. Food Fair was able *72 to buy such merchandise inventory for about $50,000 less than the cost to petitioners. At the time of the sale to Food Fair each of the leases affecting the four supermarkets had an unexpired term of approximately 13 years. The "closing date" provided for in Article III, section 4, of the agreement of December 7, 1954, was fixed as January 10, 1955. The liquidations of the three corporations and the sale by petitioners were consummated as of that date. After the sale of the four supermarkets from petitioners to Food Fair, the latter removed all of the exterior Budget Market signs and replaced them with electric Food Fair signs, replaced all existing color schemes and signs with Food Fair color schemes and signs and replaced the general branded merchandise with Food Fair brands of merchandise. In their individual income tax returns for 1955, petitioners reported the total profit realized by them on the liquidation of the three corporations operating the four supermarkets, having received and valued the fixtures, equipment, and leaseholds of the four stores at $731,333. These assets, less two automobiles, valued at $6,333, or a net asset value of $725,000, were sold and transferred *73 to Food Fair for the same amount of $725,000. In determining the deficiencies of petitioners Harry and Bertha Shwartz for the calendar year 1956, the respondent included in their net income for that year the amount of $27,500 which, in a statement attached to the deficiency notice, he explained as follows: It is determined that the amount of $27,500.00 received by you from Food Fair Stores, Inc., in each of the taxable years ended December 31, 1955, and December 31, 1956, pursuant to the terms of the restrictive covenant not to compete for a period of two years which is contained in the agreement dated December 7, 1954, is includible in ordinary income under the provisions of section 61 of the Internal Revenue Code of 1954, and is not a capital gain item. The respondent made the same determination and explanation in determining the deficiencies of petitioners Irving and Anna Weitz for the calendar year 1956. In the same deficiency notices the respondent determined overassessments for the calendar year 1955. Petitioners Harry and Bertha Shwartz omitted claiming credit for $598 representing income tax withheld from wages in computing their tax liability *74 for the calendar year 1956. Opinion The question at issue is one largely of ultimate fact, namely, whether petitioners and Food Fair dealt with the restrictive covenant contained in the agreement of December 7, 1954, as an item wholly severable from the consideration received for the assets sold by petitioners to Food Fair, or whether in substance the payments ostensibly made for the covenant were in reality nonseverable from the consideration paid for all the assets. In this type of case the buyers are frequently found claiming that the covenant is severable, in which case the price paid for it may be amortized and deducted over the life of the covenant, whereas the sellers, as is the case here, usually claim that the covenant is nonseverable, in which event the gain if any from the sale of the assets may be taxed as capital gain rather than as ordinary income. Some of the cases brought by the buyers and sellers, respectively, involving the same covenant in each case, are in the margin. [1] The Government is not required to acquiesce in a taxpayer's election but "may look at actualities and upon determination that the form employed for doing business or carrying out the challenged *75 tax event is unreal or a sham may sustain or disregard the effect of the fiction as best serves the purposes of the tax statute." Higgins v. Smith, 308 U.S. 473. We are not unmindful that in the instant proceedings, aside *76 from the evidence introduced by the respondent, we have only the sellers' version of the transaction here involved.[2] Each case, however, must be decided upon its own facts. In the instant proceedings, we have considered with close scrutiny all of the evidence and have concluded that petitioners are correct in their contention that although the agreement of December 7, 1954, formally made an allocation of $110,000 to the restrictive covenant, such allocation must be disregarded as unrealistic for many reasons. Cf. Higgins v. Smith, supra.
In the first place, there was never at any time any good faith bargaining for the covenant. During all of the negotiations the parties were considering the purchase and sale of the "leases, good will, fixtures and equipment." Petitioners at first wanted $1,000,000 *77 and Food Fair offered only $500,000. After a lapse of several months, and after petitioners had made about $250,000 of improvements on the properties, negotiations were resumed with petitioners asking for $750,000 and Food Fair offering only $600,000. Food Fair later increased its offer to $700,000 but in so doing they said they would have to put some phrasing in the agreement about a restrictive covenant. Petitioners' representative asked what that meant and was told that petitioners would agree not to compete and that with such a covenant in the agreement, Food Fair would gain some tax benefit. Petitioners, having no intention of competing and knowing they could not compete with Food Fair, said they had no objection to the covenant but insisted that the price be raised to $750,000. They settled for $725,000. In our findings, we have set out the material provisions of Article IV of the agreement of December 7, 1954. Section 1 of this article specifically provided that the sellers agree to sell and the buyer agrees to purchase the following: (a) Fixed Assets. (b) Salable Merchandise Inventory. (c) Assignments of Leases and Lease Modifications. Notwithstanding this specific *78 designation of what was being sold and purchased, section 3 of Article IV, in allocating the purchase price of $725,000 previously agreed upon in conference, allocated $615,000 to "Fixed Assets" and $110,000 to "Agreements not to compete." Nothing was allocated to the leaseholds which had unexpired terms of approximately 13 years and were among the assets which in the agreement the sellers specifically agreed to sell and the buyer specifically agreed to buy. The leases were so valuable that the agreement of December 7, 1954, contained an entire article (Article III) with 4 sections, and a schedule (Schedule B) listing the leases. Section 3 of Article III stated in part that "If all of such Lease Modifications are not procured within the time hereinafter set forth, Buyer at its option may on written notice to Sellers * * * terminate this agreement * * *." Petitioners knew they could not compete against Food Fair. They had no intention of doing so and in fact did not do so after the 2-year period mentioned in Article VI had expired. Their merchandise inventory that had cost the three corporations $340,000 could be purchased by Food Fair for about $50,000 less than that figure. Under *79 all these circumstances, we hold it is reasonable to conclude that the covenant not to compete was unilaterally injected by Food Fair solely to obtain a tax advantage and that the amount ostensibly paid for such a covenant was in fact and reality nonseverable from the entire consideration of $725,000 paid to petitioners for all the assets, including the leases and good will, for which no amount of the purchase price was formally allocated in the agreement of December 7, 1954. Cf. Ray H. Schulz, 34 T.C. 235 (May 19, 1960). It follows that the respondent erred in taxing to petitioners in 1956 as ordinary income one-half of $110,000 received by petitioners in 1956, ostensibly paid to them as consideration for the covenant. We so hold and we so decide. Decisions will be entered under Rule 50. Footnotes
1. Toledo Newspaper Co., 2 T.C. 794 (seller), and Toledo Blade Co., 11 T.C. 1079, affirmed per curiam 180 F.2d 357 (C.A. 6) (buyer), both involved the same covenant which was held to be nonseverable. Gazette Telegraph Co., 19 T.C. 692, affd. 209 F. 2d 926 (C.A. 10) (buyer), and Clarence Clark Hamlin Trust, 19 T.C. 718, affirmed sub nom. Hamlin's Trust v. Commissioner, 209 F. 2d 761 (C.A. 10) (seller), both involved the same covenant which was held to be severable. In the recent case of Ray H. Schulz, 34 T.C. 235↩ (May 19, 1960), we had both the retiring partner and the continuing partners before us, in which case we held that certain payments to a retiring partner, ostensibly made to him for his covenant not to compete, were in fact and reality a nonseverable portion of the consideration paid him for his capital interest in the partnership.
2. Other cases where we had only the version of one of the parties to a covenant are Wilson Athletic G. Mfg. Co. v. Commissioner, 222 F.2d 355 (C.A. 7), reversing a Memorandum Opinion of this Court; David Ullman, 29 T.C. 129, affd. 264 F.2d 305 (C.A. 2); and United Finance & Thrift Corporation of Tulsa, 31 T.C. 278↩.