MANHATTAN COMPANY OF VIRGINIA, INCORPORATED (A DISSOLVED CORPORATION), PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

MANHATTAN COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3535–65 and 7097–65. Filed April 17, 1968.

*H. Cecil Kilpatrick* and *William J. Lehrfeld*, for the petitioners. *Charles F. T. Carroll*, for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in income taxes of petitioner the Manhattan Co. in the amounts of $5,185.03, $2,322.48, and $1,470.67 for the taxable years 1961, 1962, and 1963, respectively,

and determined a deficiency in the income tax of petitioner the Manhattan Co. of Virginia, Inc., in the amount of $1,399.17 for the taxable year 1962.

The issue for decision is whether petitioners are entitled to deduct the cost of customer lists in the year of purchase, or if not, whether petitioners are entitled to deductions for amortization or depreciation of such customer lists over the lives of the assets or whether such lists are capital assets of a nature not subject to depreciation or amortization.

FINDINGS OF FACT

Some of the facts were stipulated, and those facts are so found.

The Manhattan Co. (hereinafter referred to as Manhattan), is a corporation organized under the laws of the State of Maryland. Manhattan filed its Federal corporation income tax returns for the calendar years 1961, 1962, and 1963 with the district director of internal revenue, Baltimore, Md. Its principal place of business at the time its petition was filed was Washington, D.C.

The Manhattan Co. of Virginia, Incorporated (hereinafter referred to as Virginia), was a corporation organized under the laws of the State of Virginia. Virginia filed its Federal corporation income tax return for the calendar year 1962 with the district director of internal revenue, Richmond, Va. Virginia was a wholly owned subsidiary of Manhattan throughout the years here at issue and until April 2, 1964, when it was dissolved and its assets and business taken over by Manhattan.

Both Manhattan and Virginia, during the taxable years here in issue, were engaged in the laundry and drycleaning business, including home pickup-and-delivery, in the Washington, D.C., metropolitan area.

On March 20, 1961, petitioners entered into several agreements with Arcade-Sunshine, Inc. (hereinafter referred to as Arcade), and two of its officers. Petitioner Manhattan entered into an agreement with Arcade to acquire a list containing 2,601 names and addresses of customers in the District of Columbia and Maryland, all of whom were using home pickup-and-delivery services of Arcade for both laundry and drycleaning. A consideration of $33,290 was assigned to this acquisition, which was paid to Arcade by Manhattan. Arcade and Manhattan also entered into an agreement prohibiting Arcade from competing with Manhattan in the "retail house-to-house pickup" of laundry and drycleaning items for a period of 10 years. A consideration of $24,000 was assigned to this agreement. Manhattan and two officers of Arcade, Leonard R. Viner (hereinafter referred to as Viner) and Ralph L. Cohen (hereinafter referred to as Cohen), entered into

similar agreements whereby Viner and Cohen covenanted not to compete with Manhattan for terms of 10 years and 5 years, respectively. The agreement between Manhattan and Arcade for the purchase of the customer lists specifically provided that Arcade was not transferring or Manhattan acquiring any right to use of the Arcade name.

Also on March 20, 1961, Virginia agreed to acquire a list containing 1,753 names and addresses of customers in Virginia all of whom were using home pickup-and-delivery service of Arcade for both laundry and drycleaning. A consideration of $23,429 was assigned to this agreement, which was paid by Virginia. Arcade, for a consideration of $16,000, agreed not to compete with Virginia in the "retail house-to-house pickup" of laundry and drycleaning items for a period of 10 years. Viner and Cohen also agreed not to compete with Virginia for periods of 10 years and 5 years, respectively. The agreement between Virginia and Arcade for the purchase by Virginia of the customer lists specifically provided that Arcade was not transferring and Virginia was not acquiring any right to use of the Arcade name.

Generally only persons who have laundry picked up at their homes, whether a full bundle or only certain laundry items such as shirts, use pickup-and-delivery service regularly for drycleaning. Therefore most of petitioners' drycleaning customers on their pickup-and-delivery routes are regular laundry customers.

Negotiations leading up to the execution of the agreements between petitioners and Arcade were originated by Arcade at a local meeting of laundry representatives. Arcade's president stated to this group that Arcade wished to dispose of its business of home pickup-and-delivery of laundry and drycleaning and would sell its lists of customers in that business. After considerable negotiations, petitioners and three other laundry companies reached agreement with Arcade on the terms of the sale.

The price paid for the customer lists was based upon the number of customers on each list and the gross revenues Arcade had received from those customers in 1960. In determining the price to be paid for the customer lists petitioners and Arcade did not consider and evaluate each customer separately. Petitioners did not see the lists of Arcade's customers prior to the execution of the agreements but were supplied by Arcade with only the weekly dollar volume of laundry and drycleaning from each of Arcade's routes and the number of customers in each route for the calendar year 1960. The volume of business varies considerably among customers.

The customers of Arcade on the lists acquired by petitioners included some names of customers other than individuals. Of these customers other than individuals, Manhattan, at the date of the trial of this case, was still serving the following:

Eastern Area Red Cross
Northern Virginia Juvenile Detention
  Home
Madeira School
St. Agnes School
Blessed Sacrament Rectory
Commercial Engineering Co.
U.S. Chamber of Commerce

National Savings & Trust Co.
Bowen Building
Cafritz Co. (two locations)
Julius Garfinckel & Co.
U.S. Treasury Building
Potomac Park Apartments
Collins & Shearer

Petitioners at the date of the trial of this case either had never acquired or had lost 15 similar customers. Approximately 159 of the names of individuals on the list showed Madeira School as their address. Generally the business which Arcade had been receiving from the customers other than individuals on the lists purchased by petitioners was for a specific type of work such as drapery cleaning or was work for an individual located at the address. Although the individual names of the customers at the Madeira School have changed since petitioners acquired the lists from Arcade, the number of individual customers served at that address has remained relatively constant. Petitioners have on their records considered any customer at the Madeira School as a former Arcade customer since they originally obtained the account from Arcade.

Petitioners would not have purchased the customer lists without the covenants not to compete. In addition to remaining in the wholesale and retail store drycleaning and laundry business, Arcade retained its rug-cleaning business and retained a copy of its customer lists to use in connection with its rug-cleaning operations. In the negotiations between Arcade and petitioners, the income tax consequences of allocating the overall price between the customer lists and the covenants not to compete were considered. Arcade wanted a higher price placed on the customer lists because of the view that such lists were capital assets, whereas payments under the covenants were ordinary income.

The names and addresses of the Arcade customers that petitioners purchased were in the form of lists that Arcade had made from its addressograph plates. On receipt of the lists, petitioners had addressograph plates made for each person on the lists, and the new plates were placed in files on petitioners' route trucks. Petitioners' plates indicated that the persons named were former Arcade customers. These plates were placed in petitioners' truck files according to the days each person for whom a plate had been made had been serviced by Arcade and that person's respective position on the route.

Under the provisions of the agreements between Arcade and Petitioners, Arcade obligated itself to maintain its service standards until the closing and for a transition period. In order to effect an orderly transition at the option of petitioners the transfer of routes was to be made gradually over a period of about 4 weeks, and Arcade

agreed to continue to service any customers not yet solicited by petitioners during this 4-week period. The agreement also provided that petitioners would collect and turn over to Arcade accounts owing to Arcade by customers petitioners had commenced serving. Petitioners assigned supervisors to ride with its route salesmen during the transition period to insure that customers were solicited and to verify the results of that solicitation. The solicitation of all of the Arcade customers was completed by the middle of 1961.

For the purpose of comparing the volume of business received by Arcade in 1960 from the customers whose names were on the lists purchased by petitioners with the volume of business received by petitioners from these same customers, petitioners made a compilation of three 4-week periods which showed the following:

|  | 4-week period ending— | | |
|---|---|---|---|
|  | May 20 | June 17 | July 15 |
|  |  | (Net of) |  |
| Arcade (1960) | $42,389 | $39,929 | $34,589 |
| Petitioners (1961) | 33,962 | 33,298 | 28,516 |
| Reduction | 8,427 | 6,631 | 6,073 |

Petitioners' total revenue from all their customers from laundry and drycleaning for these same 4-week periods in 1961 was as follows:

| Period ended— | Amount |
|---|---|
| May 20, 1961 | $209,955 |
| June 17, 1961 | 224,795 |
| July 15, 1961 | 202,823 |

The aggregate dollar volume of receipts by petitioners from laundry and drycleaning services from all their customers during the calendar years 1960 through 1965 was as follows:

| Year | Amount | Year | Amount |
|---|---|---|---|
| 1960 | $2,095,947.46 | 1963 | $2,471,683.47 |
| 1961 | 2,460,074.35 | 1964 | 2,383,352.24 |
| 1962 | 2,563,958.04 | 1965 | 2,422,207.37 |

The customer lists purchased by petitioners had been divided by Arcade into 18 routes. A route represented a geographical area in which one of Arcade's employees picked up and delivered laundry and drycleaning for Arcade's customers. Arcade had 36 such routes. Three other laundry companies purchased from Arcade the other 18 routes that petitioners did not purchase. Prior to purchasing the 18 routes from Arcade, petitioners had routes covering the same geographical areas that were covered by the 18 Arcade routes. Petitioners integrated the routes they purchased into their then-existing routes. Because of increased customers on their routes after they integrated

the customers they acquired from the lists purchased from Arcade with the customers they were servicing prior to the purchase of these lists, petitioners made certain divisions of the integrated routes, resulting in petitioners' having 7 more routes after the purchase of the Arcade lists than before that purchase.

At the time petitioners acquired the customer lists from Arcade, they hoped to expand their business on a permanent basis. Petitioners purchased from Arcade at this time additional machinery for processing laundry and drycleaning.

There have been variations in the number of petitioners' customers from 1961 through 1965 and during these years there has been a loss of customers in certain years as compared to the previous year. However, in the year 1965 petitioners had a greater total number of customers than in 1961. Petitioners acquired some new customers through referrals and recommendations of customers previously served. Petitioners are unable to determine whether these new customers are referred by customers whose names were on the lists acquired from Arcade or by other customers. Petitioners also acquired some new customers by their routemen's solicitation of new occupants of residences on their routes. Since 1961 petitioners have increased their number of routes. They have added three routes in addition to the seven routes that were added at the time the customer lists were acquired from Arcade.

Petitioners frequently lose customers because they move out of the area served by petitioners. Petitioners' routemen are asked to call on new occupants of vacant properties and solicit their business. Some new business has been acquired in this manner.

Some customers on the lists purchased from Arcade are still customers of Manhattan and may continue to be for many years to come. Petitioners have no way of estimating when the last customer on the lists acquired from Arcade will cease to do business with Manhattan.

The metropolitan Washington area is considered in the laundry business to be one of the most transient areas in the country. It has been the experience of petitioners over many years of doing business in the Washington metropolitan area that their normal losses of customers in this area run from 21 to 25 percent each year, and other companies in the area have experienced losses of as high as 31 percent. Petitioners' experience indicates that their cost of obtaining new customers through advertising amounts to about $18 per customer. When a customer on one of the petitioners' routes moves from one address to another address in the metropolitan Washington area, petitioner's routeman on the route from which the customer moves is given a bonus if the customer continues regular use of petitioners' services for laundry and drycleaning at his new address. Where service is continued by

the customer in this manner, petitioners do not record the change from one route to another as the loss of one customer and the acquisition of a new customer.

In each of the areas where petitioners purchased the lists of Arcade's customers, as well as the areas where the other laundry companies acquired lists from Arcade, home pickup-and-delivery service was supplied, both before and after Arcade's sale of its lists, by a number of laundry companies. There was no agreement between petitioners and the other three purchasers of lists to cease competition in these areas.

There were no contracts between Arcade and any of the customers on the lists sold to petitioners by Arcade, nor were there any contracts between petitioners and any of such customers after the sale of the lists. Such customers were under no obligation to give their business to petitioners.

Manhattan entered its aggregate cost of the customer lists, $33,290, on its books, assigning a cost of $12.80 for each customer on the list. Virginia also entered its aggregate cost of the customer lists, $23,429, on its books, assigning a cost of $13.365 for each customer on the list. As customers on the lists have been lost, by moving away or ceasing to give their business to petitioners, each petitioner has written off its per-customer cost and deducted such in the computation of taxable income for the year in which the customer was lost. The number of customers so lost and the amounts written off and deducted by each of the petitioners in computing taxable income for the years 1961 through 1965 are as follows:

|  | Manhattan | | Virginia | |
|---|---|---|---|---|
|  | Customers | Amount | Customers | Amount |
| 1961 (after 3/20) | 779 | $9,971.20 | 585 | $7,818.53 |
| 1962 | 349 | 4,467.20 | 301 | 4,022.87 |
| 1963 | 221 | 2,828.20 | 284 | 3,795.80 |
| 1964 | 280 | 3,584.00 | 129 | 1,724.08 |
| 1965 | 213 | 2,728.40 | 79 | 1,055.84 |

The total direct advertising budget for both Manhattan and Virginia in 1961 was approximately $45,000 to $50,000. Manhattan's reported taxable income for the calendar years 1961, 1962, and 1963 was $46,037.93, $55,633.35, and $40,629.89, respectively.

Respondent disallowed the deduction of the amounts written off as loss of customers on the lists acquired from Arcade by Manhattan for the years 1961 through 1963 and by Virginia for the year 1962.

OPINION

Petitioners in this case originally contended that they were entitled, in each taxable year here in issue, to deductions either under section

165(a), I.R.C. 1954,[1] as losses sustained during the taxable year in their business or under section 167(a) as depreciation of amounts computed by multiplying the average per-customer cost of the customer lists which they purchased from Arcade by the number of such customers whose patronage they lost during each taxable year.

Petitioners now claim in the alternative that the entire cost of the customer lists which they purchased from Arcade should be allowed as a deduction under section 162(a) as an ordinary and necessary business expense incurred during the taxable year in which the lists were acquired.

In support of their alternative contention petitioners argue that once they called on a customer on the lists they received from Arcade all value to the lists ceased. If they did not obtain the former customer of Arcade as a customer of Manhattan or Virginia, there was no further value to Manhattan or Virginia, and if they did obtain the former Arcade customer as a Manhattan or Virginia customer, the value of the list ceased. Petitioners state that amounts thereafter received by them from the former Arcade customers whose business they obtained were receipts for services rendered by them to the customer. Petitioners contend that any goodwill which was developed with the customer was due to the nature of the services petitioners rendered to the customer and not to the fact that the customer had been acquired from Arcade.

The evidence in this case shows that petitioners purchased the customer lists from Arcade with the expectation of increasing their business on a relatively permanent basis by retaining many of the customers for a period of time in excess of the year in which the customer was acquired. In buying the customer lists petitioners bought the knowledge that there were individuals in the areas petitioners served who were in the habit of using pickup-and-delivery laundry and drycleaning services who would need to find a new source for such service when Arcade ceased that phase of its business.

As petitioners' president pointed out in his testimony, the regular users of laundry services are generally the only regular customers for pickup-and-delivery laundry and drycleaning services. When a person does not send out laundry he generally does not regularly use pickup-and-delivery drycleaning service. The knowledge of which individuals within the route areas served by petitioners were users of pickup-and-delivery laundry and drycleaning services, coupled with the knowledge that these persons would, when Arcade ceased that portion of its business, be in need of a new source for that service, was a valuable asset to petitioners.

---

[1] All references are to the Internal Revenue Code of 1954.

Once petitioners had this information and obtained the individual as a customer, it was necessary that they render satisfactory service to the customer in order to retain the customer's business. However, this fact does not cause the value of the original knowledge of the name of the individual in need of the specific services which petitioners rendered to cease once petitioners obtained the individual as a customer. The knowledge retained its value at least as long as the individual continued as a customer of petitioners. In fact, petitioners' president so stated in his testimony.

An asset which has a value in a taxpayer's business for a period in excess of 1 year has uniformly been considered to be a capital asset the total cost of which is not deductible as a business expense in the year the asset is acquired. See *Richard M. Boe*, 35 T.C. 720, 725 (1961), and cases there cited, affd. 307 F. 2d 339 (C.A. 9, 1962). The evidence here shows that petitioners acquired the business of many of the names on the customer lists they purchased from Arcade and retained the business of many of these customers for more than 1 year. Under these facts we conclude that the customer lists are capital assets with a useful life of over 1 year.

Petitioners contend that the payment for the customer lists they bought from Arcade is comparable to the payment of advertising expenses to obtain new customers and reason that since advertising expenses are deductible as ordinary and necessary expenses, the cost of the customer lists should likewise be so deductible. Generally, advertising expenses have been considered by this Court and other courts to be ordinary and necessary business expenses. *F. E. Booth Co.*, 21 B.T.A. 148 (1930). The reason advertising expenses are so considered is that these expenses are generally of a yearly recurring nature resulting from a regular activity of a taxpayer which produces new business on a relatively consistent basis each year.

Under unusual circumstances, where extraordinary advertising has developed assets with a useful life extending over a period of more than 1 year, this Court has held that the expenditure should be capitalized and the cost of such advertising amortized over the period of the useful life of the asset developed. *Liberty Insurance Bank*, 14 B.T.A. 1428, 1435 (1929), reversed on another issue 59 F. 2d 320 (C.A. 6, 1932).

We hold that petitioners are not entitled to deduct the entire amounts paid by them to Arcade for customer lists in the year in which such customer lists were purchased.

In deciding the first issue, we have stated that the asset each petitioner obtained through the purchase of the lists from Arcade was a capital asset having a useful life of more than 1 year. Since the lists are a capital asset, no loss resulted to petitioners in connection with the lists until the capital asset ceased to have any value. Therefore, to agree

with petitioners' contention that they suffered a business loss each time they lost the business of one customer on the customer lists they purchased would necessitate considering each customer's name as a separate asset which became worthless when that customer's business was lost.

In numerous cases involving purchases of customer lists, or perhaps better stated the information derived from such lists, by one taxpayer from another, we have held that the asset purchased was a single indivisible asset and not an aggregation of assets, one asset being represented by each customer's name. See *Anchor Cleaning Service, Inc.*, 22 T.C. 1029 (1954), and *Thrifticheck Service Corporation*, 33 T.C. 1038 (1960), affd. 287 F. 2d 1 (C.A. 2, 1961). In *Thrifticheck Service Corporation*, at 1047, we stated in referring to customer contracts purchased as a part of the purchase of the entire business:

The cancellation of a contract would not destroy the value of the larger asset of which it was a part, but would merely reduce its value, which might be restored by the accquisition of new customers under similar contracts.

In the instant case the customer lists were not acquired as a part of a going business. Petitioners got no right to use the Arcade name but merely acquired the customer lists and the covenant of Arcade and its principal officers not to compete for a period of years. This does not in our opinion cause the customer lists to take on the nature of a separate asset for each name on the list as distinguished from a single intangible asset for each of petitioners.

Petitioners' final contention is that if the customer lists each of them purchased are to be considered as a single capital asset, they have shown that this asset has a limited useful life in their business and therefore they are entitled to an allowance for depreciation under section 167(a). Petitioners futher contend that the method they used to compute their claimed losses is an acceptable method for computing depreciation. The method petitioners contend is a proper method for computing depreciation of their customer lists is to assign an average cost to each customer and multiply this average by the number of customers lost in each year to arrive at the total depreciation for the year.

Section 1.167(a)–3 of respondent's regulations provides, "If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance."

The evidence here shows that the information which petitioners gleaned from the customer lists afforded them the advantage of being able to contact persons known to be using home pickup-and-delivery

laundry and drycleaning service and to be in need of replacing the company from which such service had been obtained. When petitioners contacted a person whose name was on the list and did not obtain the business of that person, there was an immediate diminution in the value of the intangible asset which petitioners had acquired from Arcade. When petitioners contacted a person whose name was on the list and obtained the business of that person, there was a continuing value to the asset petitioners had acquired from Arcade, at least as long as the customer remained a customer of petitioners. When petitioners acquired a new customer from the Arcade lists, they also acquired the possibility of advantages other than that customer's business such as other customers whose business might come to them by recommendation from that customer.

Because of the continuing advantages to a purchaser of a customer list, as well as the possibility of a person whose name is on the list becoming a customer of the purchaser for an indefinite period of time, numerous cases have held that a customer list is an asset which does not have a reasonably ascertainable useful life. Some of these cases have likened a customer list, particularly when the list has been acquired as one of the assets of a going business, to goodwill. Goodwill has uniformly been held not to be subject to depreciation since it is not generally a wasting asset of the business to which it attaches, but rather an asset with an indefinite useful life. The cases have not, however, been uniform in their treatment of customer or subscription lists or similar assets as being in the nature of goodwill, particularly when the asset is acquired separate from the acquisition of the business as a going concern or the goodwill of the seller. In *Vaaler Insurance, Inc.* v. *United States,* — F. Supp. —— (D.N.D. Jan. 8, 1968), the information contained in insurance expirations files which in substance is the same type of asset as a customer list, acquired under an agreement providing for the transfer of the seller's insurance business including goodwill, was held to be an intangible asset subject to exhaustion with a useful life of 5 years. In that case the court found that even though the agreement between the buyer and seller provided for the sale of the entire insurance business including goodwill, no goodwill was in fact transferred and the purchaser never used the seller's name or business location. The seller did write one letter to his customers advising them of the transfer to the buyer of the insurance expirations. In its conclusions of law the court stated:

I. The information contained in insurance files and daily reports, commonly referred to as "expirations" is an intangible asset subject to exhaustion. *Hill* v. *Commissioner,* 3 BTA 761; *Savings Assurance Agency, Inc.* v. *Commissioner,* 1963 P–H TC Memo p. 63,052; *Weaver* v. *United States,* 15 AFTR 2d 1073 (W.D. Okla. April 15, 1965) ; *Stewart* v. *United States,* 16 AFTR 2d 5604 (N.D. Okla. February 24 ,1965).

The case of *Stewart* v. *United States*, an unreported case (N.D. Okla. 1965, 16 A.F.T.R. 2d 5604, 65–2 U.S.T.C. par. 9607), referred to in *Vaaler Insurance, Inc.* v. *United States*, *supra*, involved a composite price paid for an insurance business and a covenant not to compete. The court allocated a portion of the price to the name and goodwill of the seller which was considered not to be a wasting asset. It allocated a portion of the price to the insurance expirations and held this asset to have a useful life of 5 years and to be depreciable over that period.

In *Wikle* v. *United States*, an unreported case (N.D. Ala. 1965, 15 A.F.T.R. 2d 949, 65–1 U.S.T.C. par 9403), the court held that a taxpayer who purchased insurance expirations but did not purchase a going concern was not entitled to a depreciation deduction because the information which he purchased did not have a reasonably ascertainable useful life. In reaching this conclusion, the court stated in part:

> Mr. Lammons [plaintiff's counsel] had a case from—which was decided by the Tax Court, this case of *Savings Assurance Agency, Inc.*, involving the years 1956 and 1957, a case which I believe was decided in 1962 and that case was right squarely in his favor. I really disagree with the conclusion which the Tax Court reached in that case. * * *
>
> * * * If an intangible asset is known from experience and other factors to be of use in a business in producing income for a limited period, the length of which can be estimated with reasonable accuracy, an intangible asset may be the subject of a depreciation allowance.
>
> So the question is were these * * * expirations, * * * known from experience or other factors to be of use in the insurance business * * * for only a limited period? * * *
>
> * * * it could not be said, I think, that the information which enables him to go in and get that record has lost its vitality, because it is then muted and may go along for years and years and carry on a policy of insurance * * * So it cannot be said that the information which is bought * * * has a known limited life. * * *

The case of *Commissioner* v. *Seaboard Finance Co.*, 367 F. 2d 646 (C.A. 9, 1966), affirming a Memorandum Opinion of this Court, involved the question of whether an amount paid by a purchaser of a small loan business in excess of the face value of the loans outstanding and the fixed assets of that business was subject to depreciation. The Ninth Circuit affirmed the holding of this Court that of the excess amount or "premium" paid, "thirty percent * * * was attributable to goodwill and other nondepreciable elements of value" and "that the remaining seventy percent of the premium was attributable to the loan accounts and was therefore depreciable over the average useful lives of those accounts." The court pointed out that this Court recognized that there were elements of value to the purchaser (1) in the probability of renewals of the purchased loans two or three times,

(2) from the new business from refinancing the purchased loans, (3) from the business that comes from new loans made by former customers, (4) from life insurance sales to loan customers, and a number of other continuing items which would be of value to the purchaser for an indefinite period. The court concluded that the 30 percent of the premium paid which was allocated to these various elements was sufficient.

In discussing the contention of the Commissioner that the loans together with the goodwill engendered from their acquisition were an "indivisible asset" the court stated (367 F. 2d at 652) :

The Commissioner asserts that the customer structure should be treated as an indivisible asset with an indeterminate useful life (and hence, not depreciable) because although its value may fluctuate from time to time as contracts expire and are replaced by new ones, this should not be regarded as a process of exhaustion, but as a process by which a continually existing asset is kept intact.

The rationale and purpose of the "indivisible asset" rule is to prevent taxpayers from increasing the value of depreciable property to offset the amount paid in excess of book value of assets purchased. This doctrine makes it possible to strike down depreciation deductions for amounts which should properly be allocated to good will.

Generally, the "indivisible asset" reasoning has been used in cases where a taxpayer acquired a going concern with the primary value of the acquisition being goodwill and going-concern value. In such cases courts have generally refused to sort out some small portion of the asset acquired which might be of a wasting nature. .

In the case of *Anchor Cleaning Service, Inc., supra,* the taxpayer acquired customer lists of a portion of a competitor's business together with the name and goodwill of the business. This Court held that even though the purchase price of the assets acquired by the taxpayer had been determined by multiplying the monthly amount of each account's billing by a fixed sum thus determining a value for each separate account, the taxpayer was not entitled to a business expense or loss deduction for the amount allocated to the customers of the seller whose business it did not acquire or lose. The only basis on which the taxpayer in the *Anchor Cleaning Service* case claimed deduction was as a business expense or loss. However, in *Anchor Cleaning Service, Inc., supra* at 1033, we stated :

It is quite clear that the acquisition of the accounts in question constituted a capital investment and that the principal element of the property so acquired was goodwill. *The Pevely Dairy Co.,* 1 B.T.A. 385. Nor do we understand petitioner seriously to contend otherwise. This being true, the deductions sought cannot be justified under section 23(a). Furthermore, since the element of goodwill is involved, it is also clear that such deductions are not allowable under section 23(1). Cf. *Red Wing Malting Co.* v. *Willcuts,* 15 F. 2d 626. See also Regs. 111, sec. 29.23(1)–3.

There is nothing in any of the cases to which our attention has been directed to require a conclusion that where a customer list is acquired

as an asset separate from a going concern or the name or goodwill of the seller's business, the asset by its very nature is not subject to depreciation. In fact, the cases involving insurance expirations and *Commissioner* v. *Seaboard Finance Co.*, *supra*, consider the issue of whether the information contained on a customer list acquired apart from a going concern is an intangible asset with a reasonably determinable useful life so as to be subject to depreciation, to be a question of fact to be decided on a case-by-case basis. If there is some element of goodwill or other nondepreciable value acquired in connection with the acquisition of a customer list which otherwise has a limited useful life in the taxpayer's business, there is no reason why the purchase price should not be allocated between the nondepreciable portion and depreciable portion of the asset when the record contains sufficient facts to permit such an allocation.

In many cases involving purchases of tangible assets such as land and buildings, it is necessary to allocate a composite price between the nondepreciable land and the depreciable building. Because the allocation may be a difficult one has never been considered as justification for not making the segregation. In *Northern Natural Gas Co.* v. *O'Malley*, 277 F. 2d 128, 131 (C.A. 8, 1960), it was pointed out that, "the statute itself makes no distinction between tangible and intangible property."

Certainly the fact that the information on a customer list is considered as one asset and not a conglomerate of several hundred or several thousand individual assets, each with a separate useful life, does not require that there be no segregation between the portion of the asset which has an ascertainable useful life and the portion with a continuing value in the nature of goodwill which does not have an ascertainable useful life.

Generally land with the building standing thereon is viewed as one asset but a composite price is uniformly allocated between the depreciable and nondepreciable parts of that asset.

The situation here might be compared to that involved in *Reserve Natural Gas Co. of Louisiana*, 12 B.T.A. 219, 232–233 (1928), where we stated with respect to valuation of a contract:

The purchaser of the contract acquired two elements of value—first, by the terms of the contract it had an assured return, enforceable under the contract. of 2½ cents a thousand from the purchase and sale of 6,750,000,000 feet of gas a year during 20 years. Second, in addition to the assured and enforceable business, it acquired a business relationship and strategical position that would practically assure it of handling any additional business of the three gas companies. The latter was the prime factor in the organization of petitioner.

This second element would of course extend beyond the life of the contract, but during the life of the contract it was inseparable therefrom and would have passed with the contract to a purchaser thereof. This element also was susceptible of valuation and a prospective purchaser would have been called upon to pay therefor an amount representing its fair value.

The contract had a life of 20 years and, in determining the value of the contract to a prospective purchaser, we can only consider the two elements of value for a period of 20 years. Any value beyond that period could not be a part and parcel of the contract, although growing out of it and resulting from it.

In the instant case the evidence shows that it has been petitioners' experience over many years that they would lose from 21 to 25 percent of their customers each year. Petitioners' president stated that petitioners had to obtain new customers to the extent of 20 percent of the customers they had in any year to "stand still." Except for certain customers such as the Madeira School and some particular types of business for other institutional customers, the inference from the record is that the customers petitioners obtained from Arcade were individual customers. However, 159 of the individual customers were at the Madeira School, and although these same customers by name might not be retained, petitioners could expect on an indefinite basis to retain the same number of individual customers at the Medeira School. The transient nature of customers for laundry and drycleaning pickup-and-delivery service in the Washington metropolitan area would not affect a customer such as the Madeira School.

The testimony of petitioners' president shows that most of the customers which petitioners obtained by contacting the names on the list from Arcade were individual householders who would have the same susceptibility of being lost as customers, by moving from the Washington metropolitan area or for other reasons, ceasing to use pickup-and-delivery service for laundry and drycleaning as petitioners' other customers.

While the record does not afford a basis of determination with precision of the portion of the amounts paid for the customer lists purchased by petitioners from Arcade which should be allocated to continuing advantages obtained after an individual customer was lost or to customers such as the Madeira School where there existed a reasonable expectation of retention of the customer for many years or an indefinite period, we consider there to be sufficient evidence to permit of a reasonable allocation of approximately 25 percent of the purchase price of the customer lists to the continuing value derived from the lists.

In situations comparable to that here present we have made allocations of a composite price. In *United Finance & Thrift Corporation of Tulsa*, 31 T.C. 278 (1958), affd. 282 F. 2d 919 (C.A. 4, 1960), certiorari denied 366 U.S. 902, we allocated a part of a composite price to covenants not to compete and permitted deduction of the amount so allocated over the term of years of the covenants. Likewise, in *Frances E. Latendresse*, 26 T.C. 318 (1956), affd. 243 F. 2d 577 (C.A. 5, 1957), we held a part of payments for interests acquired by a decedent in agency contracts to be applicable to renewal commissions and deter-

mined the proper amortization deductible in each of the years there involved with respect to the renewal commissions, even though the facts did not permit the computation with mathematical accuracy. In that case we stated that we were exercising "our judgment in determining the amount allowable in each year since to allow no amortization under the present circumstances would be the one completely wrong conclusion."

On the basis of all the evidence in the instant case we have concluded that 25 percent of the amounts paid by each petitioner to Arcade for customer lists should be allocated to continuing value of those lists including any value in the nature of goodwill which resulted to petitioners from use of those lists and other nondepreciable elements of value acquired by petitioners.

The remaining 75 percent of the cost to each petitioner of the customer lists is allocable to the depreciable part of the intangible asset consisting of the information acquired by petitioners from the customer lists which enabled them to contact customers for pickup-and-delivery laundry and drycleaning business and in many instances to obtain their business.

Respondent's final contention is that even if the customer lists are assets of a nature subject to depreciation, petitioners have failed to show that the method they have used to compute their claimed deductions in each year is proper.

We agree with respondent that on the basis of this record, there is nothing to support a determination that the amount paid for each customer may be arrived at by dividing the number of customers whose names appeared on the lists into the total amount paid for the lists. In fact the record affirmatively shows that the various customers did have different values to petitioners and that the price to be paid for the customer lists was not arrived at by petitioners and Arcade on a per-customer basis. Furthermore, since part of the asset acquired by each petitioner had a continuing value, as we have heretofore discussed, there would still be error in petitioners' method of computing their claimed deductions for depreciation or amortization even if the record afforded some method of determining an accurate per-customer cost of the names on the customer lists.

The record here shows that of the typical customers acquired by petitioners from the Arcade customer lists, they could expect to lose approximately 20 percent a year. From this and the other evidence in this record, we conclude that from the experience of petitioners the information on the customer lists which had a limited useful life had such a useful life of approximately 5 years. We therefore conclude that the 75 percent of the cost of the customer lists which we have allocated to an intangible asset of a wasting nature should be depreciated on a 5-year basis.

Accordingly, we hold that petitioner Manhattan is entitled to a deduction of 20 percent of the value of its depreciable intangible asset (75 percent of the amount it paid Arcade for the customer lists) in each of the years 1961, 1962, and 1963, and that petitioner Virginia is entitled to depreciation in the amount of 20 percent of its depreciable intangible asset (75 percent of the amount which it paid Arcade for the customer lists) for its taxable year 1962.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

IRWIN, *J.*, concurs in the result.

———

DRENNEN, *J.*, concurring: I agree with Judge Simpson that the method proposed by petitioners for depreciating or amortizing the cost of the customer lists is more accurate and should be used, for the affirmative reasons stated in his concurring opinion. However, I do not concur in all Judge Simpson says in his opinion with respect to the "traditional" method, wherein he implies that, absent a better method, the "traditional" method could not be used in this case.

———

SIMPSON, *J.*, concurring: I agree with the majority in holding that the entire costs of the customer lists should not be charged off as an ordinary and necessary expense of the businesses in the year when the lists were purchased. I also agree that the customer lists purchased by the petitioners had declining values and that the petitioners should therefore be allowed to depreciate those lists over their useful lives. I disagree, however, with the majority's method of determining that depreciation; I think the method proposed by the petitioners is more accurate.

In my view, the applicable tests of whether an intangible asset is depreciable are contained in the respondent's regulations, which provide:

Sec. 1.167(a)–3 Intangibles.

If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. * * * [Income Tax Regs.]

Thus, the tests to be applied are whether the intangible asset has a limited life and whether that life can be estimated with reasonable accuracy. See *Westinghouse Broadcasting Co.*, 36 T.C. 912 (1961), affd. 309 F. 2d 279 (C.A. 3, 1962), certiorari denied 372 U.S. 935 (1963); *Thrifticheck Service Corporation*, 33 T.C. 1038 (1960), affd. 287 F. 2d 1 (C.A. 2, 1961).

In applying these tests, we must look carefully at what the petitioners acquired. In acquiring the name of a customer, they learned that such person used pickup-and-delivery laundry or drycleaning service and that such a person would be in need of a new supplier of such service. Since they were not permitted to use the name of Arcade, they could not trade on the goodwill that Arcade might have built up with the customer in either acquiring the business of the customer or in retaining it. Whether they retained the business of the customer would depend upon whether they provided satisfactory services, and whether the customer would refer any new customers to them would also depend upon the services which they furnished.

The requirement of the regulations that an intangible asset must have a limited life to be depreciable is merely another way of providing that depreciation is allowable only for wasting assets. The value of the customer lists did decline over the years and will continue to do so. Some of the persons on the lists never did business with the petitioners, and others discontinued doing business with the petitioners from time to time. Though the decline in value was sporadic and not level, that fact does not deprive the petitioners of a right to an allowance for depreciation. As the customers were lost, the lists purchased from Arcade clearly lost value.

It has been argued that a customer list, despite the departure of some customers, retains its value because of referrals or because some customers continue to use the services of the purchaser indefinitely. Although the petitioners may acquire new customers as a result of referrals by those persons on the customer lists acquired from Arcade, such new customers are acquired primarily because of the satisfactory services furnished by the petitioners, and it can hardly be said that they are acquired because of the lists. Some customers on the lists, such as a boarding school, may continue to do business with the petitioners indefinitely, but that fact should not obscure the fact that other customers on the Arcade lists are discontinuing to do business with the petitioners.

The argument has also been made that the loss of customers on the lists is due to the dissatisfaction with the services of the petitioners, and not due to the natural exhaustion of the value of the lists. Although the number of customers who are lost would surely be affected by the services supplied by the petitioners, some customers would be lost because of their moving away from the community or because of their desire to have their laundry or drycleaning work handled in a different manner. Thus, some of the losses are due to forces similar to natural exhaustion. Moreover, when other customers discontinue using the petitioners' services because of dissatisfaction with those services, the loss sustained by the petitioners is nonetheless

real and substantial. Such a loss is somewhat within the control of the petitioners; however, the rate of exhaustion of business assets is often affected by the practices and procedures adopted by the user, and yet, that fact does not deprive the user of a right to an allowance for depreciation of the assets. In like manner, I think that the petitioners should not be denied a deduction for the loss in value of the lists merely because their business practices may affect the rate of that loss.

The other test for the allowance of depreciation for an intangible asset is whether the life of the asset can be estimated with reasonable accuracy. The petitioners assigned an average cost to each customer on the lists and then deducted such cost whenever a customer was lost. I think this method of determining the depreciation in value of the lists is more accurate than the method adopted by the majority.

To follow the regulations strictly and to allow depreciation in the traditional manner, the majority has determined that a portion of the customer lists is not depreciable at all and has attempted to estimate the useful life of the depreciable portion. These determinations are based on very scanty evidence. We know that some of the institutional customers are likely to remain with the petitioners indefinitely, but we have no evidence indicating whether they constitute 25 percent of the lists, 5 percent, or 50 percent. The only evidence that we have for estimating the useful life of the depreciable portion of the lists is the testimony of the president of the petitioners. He stated that they needed to obtain 20-percent new customers each year in order to "stand still" and that there was an annual turnover in customers of from 21 to 25 percent. Indeed, the petitioners have not claimed that they could estimate the useful lives of the customer lists, and such evidence was not offered for that purpose.

Section 1.167(a)–3, Income Tax Regs., provides that "No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life." In *Grant T. Rudie, Jr.*, 49 T.C. 131 (1967), we approved and applied that provision of the regulations to deny a depreciation deduction to a taxpayer who presented far better evidence of useful life than we have in this case. Morover, the taxpayer in *Commissioner* v. *Indiana Broadcasting Corporation*, 350 F. 2d 580 (C.A. 7, 1965), reversing 41 T.C. 793 (1964), certiorari denied 382 U.S. 1027 (1966), also presented vastly superior evidence of useful life and was denied a depreciation deduction. Thus, it seems clear to me that to compute an estimated useful life on the basis of the evidence that we have in this case and to allow depreciation on such basis is clearly inconsistent with the respondent's regulations and the prior decision of this Court.

Furthermore, the adoption of such a practice will raise havoc with the administration of the depreciation provisions of the law.

Although the regulations speak of estimating the useful life of an asset, I see that provision as merely the customary means for spreading the allowance for depreciation over the life of an asset. To apply such customary means in this case, it is necessary to make predictions based upon very little evidence. On the other hand, the petitioners have proposed a method which, rather than relying upon an estimate of useful life, measures more accurately the decline in the value of the lists. As in the case of cost depletion for mining, the petitioners' method determines the decline in value for each year by charging off the cost of a customer when he is lost. The use of this method also eliminates the necessity of making the dubious allocation of a portion of the costs to those customers who may remain with the petitioners indefinitely.

Thus, in this case, we have a choice between using the traditional method and relying upon dubious predictions or using a different method which more accurately measures the decline in value. Since the purpose for estimating useful life is to spread the depreciation allowance over the life of the asset, I would adopt the method proposed by the petitioners.

FORRESTER and DAWSON, *JJ.*, agree with this concurring opinion.

---

ATKINS, *J.*, dissenting: It is highly desirable that a taxpayer be allowed to offset income by deducting expenditures incurred in order to produce such income. Thus, if the useful life of an intangible business asset can be estimated with reasonable accuracy the cost thereof should be amortized and deducted over the period of such life. However, since *Danville Press, Inc.*, 1 B.T.A. 1171, the published opinions of this Court have consistently held that an intangible asset of the nature here involved is one indivisible asset which is subject to depreciation only if the asset has a useful life which can be reasonably estimated—if such asset has any substantial element of indefinite useful life no depreciation is allowable. An asset is not divisible into different components some of which are depreciable and some of which are not. See *Thrifticheck Service Corporation*, 33 T.C. 1038, affd. (C.A. 2) 287 F. 2d 1. I am not aware of any legislative enactment which would justify a basic change in our position. Since it appears that the customer lists here involved have a useful life of indefinite duration, it seems to me that the cost thereof may not be recovered under the provisions of section 167(a) of the Code.