Holden Fuel Oil Company v. Commissioner.
Holden Fuel Oil Co. v. Commissioner
Docket Nos. 929-65, 4286-70.
United States Tax Court
T.C. Memo 1972-45; 1972 Tax Ct. Memo LEXIS 209; 31 T.C.M. (CCH) 184; T.C.M. (RIA) 72045; February 23, 1972, Filed *209 Petitioner was engaged in the retail sale of fuel oil. On February 18, 1959, it entered into a contract with Gulf wherein petitioner purchased a list of fuel oil customer accounts in the same general geographical location that petitioner was then serving. Held, Petitioner is not entitled to deduct the cost of the customer list as a business expense under sec. 162, I.R.C. 1954. Held further, the list is an intangible asset, 25 percent of which is in the nature of nondepreciable goodwill and 75 percent of which had a reasonably determinable useful life, entitling petitioner to depreciation deductions. Held further, as the total cost of the list was indeterminable for the first 3 years, petitioner is permitted to deduct as an amortization deduction 75 percent of the amount paid in each of the first 3 years toward the cost of the list. Once the contract price is determined petitioner must return to the traditional method of depreciation, amortizing 75 percent of the remaining unpaid cost of the list over its 12-year remaining life. Murray P. Greenblatt, 17000 W. 8 Mile Rd., Southfield, Mich., for the petitioner. Chauncey W. Tuttle, Jr., for the respondent. STERRETT
Memorandum Findings *210 of Fact And Opinion STERRETT, Judge: The Commissioner determined deficiencies in petitioner's Federal income tax as follows: Taxable Year Ended
Amount
May 31, 1959
$ 492.35
May 31, 1960
29,242.94
May 31, 1961
8,283.72
May 31, 1962
8,247.75
May 31, 1963
560.22
May 31, 1964
4,937.96
May 31, 1965
3,253.31
May 31 1966
4,086.53
Due to concessions, the only issue remaining for our determination is whether petitioner, Holden Fuel Oil Company, is entitled to deduct the cost incurred for a customer list as a business expense in the year the liability was accrued, or if not, whether petitioner is entitled to deductions for amortization of such list over the life of the asset, or whether such list is a capital asset of a nature not subject to amortization. Findings of Fact Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Holden Fuel Oil Company (hereinafter referred to as petitioner) was incorporated under the laws of Michigan on June 1, 1955. Its principal place of business at all times material hereto was Madison Heights, Michigan. It filed United States corporate income tax returns on the accrual method *211 of accounting for the taxable years ended May 31, 1959 through May 31, 1966, with the district director of internal revenue at Detroit, Michigan. Petitioner, during the taxable years here in issue, was engaged in the retail sale of fuel oil in the Detroit, Michigan metropolitan area. It would acquire oil from major companies and sell it to the consumer. Gulf Oil Corporation (hereinafter referred to as Gulf), having decided to sell its retail fuel oil business, negotiated with several local fuel oil dealers for the sale of its customer lists. [1] On February 18, 1959, Gulf entered into a contract (hereinafter sometimes referred to as the '59 contract) with petitioner wherein Gulf agreed to sell and petitioner agreed to buy a list of fuel oil customer accounts in the same general geographical location that petitioner was already serving. The contract provided in part: The following is to confirm the understanding recently reached between you and our representative relative to the purchase by you of the Gulf Solar Heat Fuel Oil customer accounts in the area or territory covered by your Contract of Sale with us dated this date and to become effective on June 1, 1959, which accounts we propose *212 to transfer to you: Each of us agrees that the word or words "accounts", "customer accounts" and "Gulf Solar Heat Fuel Oil customer accounts" as used herein shall mean the 185 addresses to be shown in the list hereinafter mentioned to which deliveries of said fuel oil are to be made. We agree to sell and transfer to you, and you agree to purchase, accept, serve and pay for the Gulf Solar Heat Fuel Oil customer accounts in your above territory according to a list which we agree to deliver to you on or about June 1, 1959. For said accounts you agree to pay the purchase price to be determined in the manner hereinafter provided for in subparagraph (d) * * *. You shall pay: (a) One-half cent per gallon for each gallon of Solar Heat Fuel Oils you deliver to said accounts for the period from June 1, 1959, to May 31, 1960, both inclusive * * *. (b) One-half cent per gallon for each gallon of Solar Heat Fuel Oils you deliver to said accounts for the period from June 1, 1960, to May 31, 1961, both inclusive * * *. (c) One-half cent per gallon for each gallon of Solar Heat Fuel Oils you deliver to said accounts for the period from June 1, 1961, to May 31, 1962, both inclusive * * *. (d) A total *213 purchase price equal to three cents per gallon for each gallon of Solar Heat Fuel Oils delivered by you during the period from June 1, 1961, to May 31, 1962, both inclusive. The aforesaid payments at the rate of one-half cent per gallon paid by you on or before June 15, 1960, June 15, 1961, and June 15, 1962, shall be credited thereon and the remaining balance of the purchase price shall be paid in thirty-six (36) equal monthly installments, payable July 15, 1962, and monthly thereafter to and including June 15, 1965 * * *. In another contract the parties also agreed to the purchase and sale of fuel oil. This however was not an exclusive sales agreement as petitioner continued to purchase oil from other distributors, and Gulf was free to sell to other dealers. The parties also orally agreed that petitioner could sell oil under the name Gulf Oil Corporation, which it in fact did. However, this was not included as a provision in the '59 contract and was not considered when the parties determined the contract price of the customer *214 list. In addition, Gulf agreed to and did in fact pay for the cost of painting the Gulf emblem on petitioner's trucks every 3 years, for a portion of petitioner's advertising expenses and a portion of the cost of printing petitioner's stationery. On May 15, 1959, Gulf sent a form letter to each of the customers on the list conveyed to petitioner. This letter informed them that petitioner was distributing Gulf oil in the area and solicited the customers' business for petitioner. Gulf's customers were not obligated to purchase fuel oil from petitioner as there had been no contract between Gulf and its customers. Petitioner entered into another contract (hereinafter sometimes referred to as the '61 contract) with Gulf on June 13, 1961. The provisions were very similar to the '59 contract noted above. It provided in part: You shall pay: (a) One-half cent per gallon for each gallon of Solar Heat Fuel Oils you deliver to said accounts for the period from June 1, 1961 to May 31, 1962, both inclusive, on or before June 15, 1962. (b) One-half cent per gallon for each gallon of Solar Heat Fuel Oils you deliver to said accounts for the period from June 1, 1961 to May 31, 1962, both inclusive, *215 on or before June 15, 1963. (c) One-half cent per gallon for each gallon of Solar Heat Fuel Oils you deliver to said accounts for the period from June 1, 1961 to May 31, 1962, both inclusive, on or before June 15, 1964. (d) A total purchase price equal to three cents per gallon for each gallon of Solar Heat Fuel Oils delivered by you during the period from June 1, 1961 to May 31, 1962, both inclusive and the purchase price shall be paid in seventy-two (72) equal monthly installments, payable June 15, 1962, and monthly thereafter to and including June 15, 1967. Prior to the acquisition of the customer list from Gulf, petitioner had approximately 3,000 customers. A list of 5,199 potential customers was turned over to petitioner by Gulf from both of the above noted contracts. Of this number 3,007 accounts were sold fuel oil by petitioner during the fiscal year ended May 31, 1962, bringing to approximately 6,000 the total number of accounts held at the end of the 1962 fiscal year. As set forth below some of the 3,007 accounts left. The amounts in the gallonage column are the total number of gallons delivered during the fiscal year ended May 31, 1962, to the customers on the list received *216 from Gulf, which accounts were subsequently lost in the fiscal years indicated. 186 Fiscal Year
Customers
1962
Ended
Lost
Gallonage
May 31, 1963 and
May 31, 1964
582
613,016
May 31, 1965
197
225,702
May 31, 1966
265
286.468
May 31, 1967
146
164,504
May 31, 1968 240
302,676 1,430
1,592,366 These losses were due to customers moving to new locations and conversions to gas or electric heat. The popularity of gas and electric heating made the delivery of fuel oil a dying business. There were 1,577 customers still purchasing fuel oil from petitioner on May 31, 1968, of the 5,199 customers on the list originally turned over to petitioner by Gulf. However, with the assistance of a very active sales force, petitioner was able to acquire sufficient new customers to maintain the total clientele of approximately 6,000. Petitioner paid the sum of $22,665.38 to Gulf during the fiscal year ended May 31, 1960 and $15,930.23 during the fiscal year ended May 31, 1961, pursuant to the terms of the '59 contract. Petitioner deducted both of these amounts on its 1960 and 1961 corporate income tax returns. At the close of the May 31, 1962 fiscal year the parties calculated the total '59 contract cost at $93,530.40 as it was *217 determined that 3,117,680 gallons of fuel oil had been delivered during the 1962 fiscal year to accounts involved in this agreement. Petitioner deducted $77,600.17 on its 1962 return. [2] The total cost under the '61 contract was determined to be $7,909.38, inasmuch as 263,646 gallons of fuel were delivered during the fiscal year ended May 31, 1962, to accounts involved in this agreement. Petitioner deducted the full $7,909.38 on its 1962 corporate income tax return. [3]
On January 13, 1965, a notice of deficiency for fiscal years ended May 31, 1959 through May 31, 1962, was *218 mailed to petitioner. [4] Among other things, it disallowed all the deductions taken by petitioner in regard to the contracts noted above. In response to the notice of deficiency, and as an alternative to the deductions originally taken and disallowed, petitioner deducted the following: Fiscal Year Ended
Amount
May 31, 1964
$9,675.40
May 31, 1965
6,547.23
May 31, 1966
8,961.69 These deductions were classified as "selling expense-amortization," and were based on the number of customers lost each year. On June 16, 1970, a notice of deficiency for fiscal years ended May 31, 1963-May 31, 1966, was mailed to petitioner. Among other things it disallowed the amortization deductions taken by petitioner in regard to the contracts noted above. Opinion Petitioner, during the taxable years here in issue, was engaged in the retail sale of fuel oil. On February 18, 1959, it entered into a contract with Gulf wherein Gulf agreed to sell and petitioner agreed to buy a list of fuel oil customer accounts in the *219 same general geographical location that petitioner was then serving. The sole issue for our determination is whether petitioner is entitled to deduct the cost of the customer list as a business expense under section 162, I.R.C. 1954, [5] or if not, whether petitioner is entitled to deductions for amortization of such list over the life of the asset under section 167, [6] or whether 187 such list is a capital asset of a nature not subject to amortization. It is axiomatic that the cost of an asset having a useful life in excess of 1 year cannot be expensed in the year of acquisition, *220 but rather must be amortized over its useful life. Massey Motors, Inc. v. United States, 364 U.S. 92 (1960). The present facts indicate that petitioner in acquiring the customer list obtained the business of many of the persons enumerated therein, and retained a substantial portion of that business for more than 1 year. We therefore conclude that this list is a capital asset [7] and petitioner is not entitled to deduct its cost as a business expense in the year of acquisition. Having determined that the cost of the customer list is not deductible as a business expense in the year of acquisition, we must now decide whether petitioner is entitled to amortize the cost of such list over the life of the asset. The respondent's regulations referring to the depreciation of intangibles state in part: Sec. 1.167(a)-3. Intangibles. *221 If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill. Therefore, to determine if the list in question is depreciable we must decide whether it has a limited life and whether that life is reasonably ascertainable. In acquiring the list petitioner was afforded the opportunity of contacting persons who were known to be using fuel oil to heat their homes and who were in the need of a new supplier; clearly providing petitioner with a valuable asset. When, however, petitioner failed to obtain the business of one of the persons named on the list the asset immediately lost a commensurate portion of its value. *222 Petitioner initially acquired a list containing 5,199 names. As of May 31, 1968, it was supplying only 1,577 of the original 5,199 with oil, demonstrating the existence of a wasting asset. Petitioner, through its president, James C. Holden, testified that through his own experience in the field over may years he would lose approximately 10 percent of his customers each year. He also noted that trade indicators calculated the life of a fuel oil account to be from 8 to 10 years. Further, the parties stipulated that petitioner lost approximately 50 percent of its total fuel oil delivery initially acquired from the list in a 6-year period following May 31, 1962, the year the contract price was determined. [8] *223 It therefore seems apparent that the list acquired by petitioner had a limited life and that life was reasonably ascertainable. In support of this conclusion we note that in Manhattan Co. of Virginia, 50 T.C. 78 (1968), a case significantly similar on its facts, the taxpayer purchased the names and addresses of a number of home pickup and delivery laundry customers from another laundry company. This Court held that the information contained on the lists constituted an intangible asset, and, though a small portion of that asset constituted nonamortizable goodwill, the remainder had a determinable useful life entitling petitioner to depreciation deductions. [9]
We also note that the Seventh Circuit Court in Super Food Services, Inc. v. United States, 416 F. 2d 1236, 1240 (C.A. 7, 1968), in apparent agreement with the above result, stated: In our view, supported by the Seaboard Finance case, it is also immaterial whether 188 these contracts were acquired separately or as part of a going business. Any quarrel with the going concern value of contracts acquired as part of a business is properly *224 directed to the allocation to be made between goodwill and the contracts purchased and should not be relied on as requiring a complete denial of depreciation deduction to contracts shown to have a limited useful life. See also Burnet v. Niagara Falls Brewing Co., 282 U.S. 648 (1931) and Northern Natural Gas Co. v. O'Malley, 277 F. 2d 128 (C.A. 8, 1960), wherein it was held that a "reasonable approximation" of the fact and rate of depreciation or exhaustion is sufficient. Respondent, relying on Keith Misegades, 53 T.C. 477 (1969); Thrifticheck Service Corp., 33 T.C. 1038 (1960), affirmed 287 F. 2d 1 (C.A. 2, 1961); Richard Boe, 35 T.C. 720 (1961); and Anchor Cleaning Service, Inc., 22 T.C. 1029 (1954), contends that the customer list acquired by petitioner was either in the nature of goodwill, or so closely related to it as to be an indivisible part of it, [10] thereby preventing amortization of the cost of the list. We find respondent's position inappropriate and the cases cited distinguishable. *225 In the instant case petitioner bargained, contracted and paid for a list of customers. It purchased no other asset be it tangible or intangible. [11] *226 Gulf, the selling corporation, did not convey all of its assets to petitioner and liquidate, but rather continued to function as a wholesale supplier of oil. The contract entered into between the parties did not contain a covenant not to compete whereby petitioner was protected from Gulf's reentry into the retail fuel oil business. As we noted in Alfred H. Thoms, 50 T.C. 247, 255 (1968), "a covenant not to compete is a normal incident to the purchase of an insurance business including the list of expirations. It is obvious such a covenant has the function primarily of assuring the purchaser the beneficial enjoyment of the goodwill and the seller's list of expirations." Further the cases cited by respondent dealt with the sale of an entire business, including the organization's goodwill whereby there was either no allocation of price to the individual assets acquired or a covenant not to compete was included within the sales agreement. Petitioner's use of the seller's name was quite apparently for the benefit of Gulf rather than petitioner. Gulf agreed and in fact did pay petitioner for the continued public display of that name, which we surmise was done with the intention of retaining some degree of contact with the fuel oil business in the hopes of selling more fuel at the wholesale level. In addition, as noted above, the facts indicate that the contract conveying the list of customers to petitioner by its very terms conveyed only that list. It is therefore manifest that the use of the seller's name and the right to distribute fuel under that name was coincident to the fuel oil supply agreement and not to the sale of the list, and further that such right would terminate upon the expiration of the supply agreement. If there was any benefit received at all it was at best merely incidental and was obviously not indivisibly related to the sale of the customer list. [12] *227 Having determined that the customer list acquired by petitioner is amortizable, we must now ascertain the amount to be amortized and the method of amortization. This necessitates that we initially make an allocation to the nonamortizable elements present in the customer list. In Manhattan, supra, relying on Commissioner v. Seaboard Finance Co., 367 F. 2d 646 (C.A. 9, 1966), affirming a Memorandum Opinion of this Court, we noted that there was an element of continuing value to be derived from the list, including (1) probability of renewals, (2) new business, etc. and therefore, [If] there is some element of goodwill or other nondepreciable value acquired in connection with the acquisition of a 189 customer list which otherwise has a limited useful life in the taxpayer's business, there is no reason why the purchase price should not be allocated between the nondepreciable portion and depreciable portion of the asset when *228 the record contains sufficient facts to permit such an allocation. As there was in that case, there is undoubtedly here some value in the right to get "a foot in the door." Obviously in circumstances such as this the record cannot afford a basis of determining with precision the portion allocable to continuing advantages obtained from the list. However, we consider there to be sufficient evidence to permit a reasonable allocation of 25 percent of the purchase price to a continuing value of the list, permitting petitioner to amortize the remaining 75 percent. Turning to the method of amortization, petitioner contends that the "loss of customer method" is the most accurate measure of the list's loss in value. See Judge Simpson's concurring opinion in Manhattan, supra, at pp. 94-97. However, that method was not adopted by the majority of the Court which held: * * * The method petitioners contend is a proper method for computing depreciation of their customer lists is to assign an average cost to each customer and multiply this average by the number of customers lost in each year to arrive at the total depreciation for the year. * * * * * * Furthermore, since part of the asset acquired *229 by each petitioner had a continuing value, as we have heretofore discussed, there would still be error in petitioners' method of computing their claimed deductions for depreciation or amortization even if the record afforded some method of determining an accurate per-customer cost of the names on the customer lists. More recently this Court in Kentucky Central Life Insurance Co., 57 T.C. - (1972), stated: Petitioner's primary position is untenable for several reasons, the chief one being its utilization of hindsight to determine what, in fact, the actual lapse periods of the policies were. By its very nature amortization is an advance estimate of the proper period for writing off an expense, which is calculated before all of the facts are known. We are therefore required to amortize 75 percent of the list's value over its useful life. As noted above, the parties stipulated that petitioner lost approximately 50 percent of the customers initially acquired from the list in a 6-year period following the determination of the contract price at the close of the May 31, 1962 fiscal year. This determination supported the trade's estimate of the life of a fuel oil account. It is therefore reasonable *230 to conclude the list could not have had a useful life in excess of 12 years as of June 1, 1962. However the contract which initiated the sale of the list was effective as of June 1, 1959. Petitioner serviced customers acquired from the list during that 3-year period. It is therefore manifest that the list had a value during this initial 3-year period prior to the determination of the total sales price. Amortization of the cost of the list over a 15-year period beginning as of June 1, 1959, is however inappropriate as the cost was uncertain in those initial 3 years. Faced with this unusual situation we adopt the method of amortization applied in Associated Patentees, Inc., 4 T.C. 979 (1945). In Associated, the taxpayer purchased a patent. The total cost was indeterminable as the buyer was to pay a percentage of the income produced from the rental of the patent for a fixed number of years. This Court, so as to clearly reflect income, permitted the taxpayer to deduct as depreciation the amount paid in each year toward the cost of the patent. Applying that theory to the instant case, petitioner may deduct as an amortization deduction 75 percent of the amount paid to Gulf during the fiscal *231 years ended May 31, 1960, 1961 and 1962. For the fiscal year ended May 31, 1963 and thereafter, the total contract price having been determined, petitioner must return to the traditional method of depreciation, amortizing 75 percent of the remaining unpaid cost of the list over its 12-year remaining life. Decisions will be entered under Rule 50. 190 Footnotes
1. Along with petitioner Gulf negotiated with J. C. Corneille Company, D & W Oil Company, Austin Oil Corporation, Cadillac Fuel Company and Eastern Oil Company.↩
2. The $77,600.17 deduction is the total contract cost of $93,530.40 less the $15,930.23 paid and deducted in 1961. Apparently petitioner determined prior to the filing of its 1962 return that the $22,665.38 deducted in 1960 was more properly deductible in 1962. However, no adjustment was made for the double deduction prior to the receipt of the statutory notice of deficiency.↩
3. Unlike the 1959 contract there was no problem of prepayment prior to calculating the total contract price. The total cost was determined at the conclusion of the fiscal year ended May 31, 1962 and the cost was deducted on the corporate return.↩
4. Fiscal years ended May 31, 1959 and May 31, 1960 are in issue only because of a net operating loss incurred in 1962 due to the $85,509.55 deduction taken for the contracts involved in the instant case.↩
5. All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated. SEC. 1962. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *. ↩
6. SEC. 167. DEPRECIATION. (a) General Rule. - There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) - (1) of property used in the trade or business, or (2) of property held for the production of income.↩
7. Though the asset acquired consists of a series of names, this Court has held that such lists are a single indivisible asset and not an aggregate of separate indivisible assets. Thrifticheck Service Corporations, 33 T.C. 1038 (1960), affirmed 287 F. 2d 1 (C.A. 2, 1961); Anchor Cleaningservices, Inc., 22 T.C. 1029 (1954); The Danville Press, Inc., 1 B.T.A. 1171↩ (1925).
8. As noted in the facts the contract price was dependent on the number of gallons delivered for the fiscal year ended May 31, 1962. The stipulation points out that the number of gallons delivered each year decreased at an average rate of 8 percent a year between June 1, 1962 and May 31, 1968. The stipulation also indicates that the number of customers acquired from the list decreased at approximately the same rate.
9. See also Savings Assurance Agency,inc., 22 T.C. Memo. 1963-52; Vaaler Insurance Inc. v. United States, an unreported case (D.C.N.D., 1968) (21 AFTR 2d 558, 68-1 USTC 9183↩).
10. See "Amortization of Intangibles: An Examination of the Tax Treatment of Purchased Goodwill," 81 Harv. L. Rev. 859↩ (1968), wherein the indivisible asset theory is subjected to strong criticism.
11. Petitioner purchased several fuel oil trucks at a public auction initiated by Gulf. The purchase of the trucks, however, was unrelated to the acquisition of the list.
12. Petitioner, prior to acquisition of the list, was a successful retail fuel oil distributor, servicing over 3,000 customers. The use of Gulf's name did not increase petitioner's business. Of the 5,199 names initially acquired only 3,007 were purchasing fuel from it 2 years later. Six years later it was servicing only 1,577 of the original 5,199. Its ability to maintain approximately 6,000 clients was due to its conscientious sales and service department.